**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| | x |
| | : Civil Action No. |
| MICHAEL G. BRAUTIGAM, an individual, | : |
| | : VERIFIED SHAREHOLDER |
| Plaintiff, | : DERIVATIVE COMPLAINT FOR |
| | : BREACH OF FIDUCIARY DUTY |
| vs. | : AND FOR CONTRIBUTION AND |
| | : INDEMNIFICATION |
| | : |
| | : |
| LLOYD C. BLANKFEIN, GARY D. COHN, | : |
| DAVID VINIAR, CLAES DAHLBACK, | : |
| STEPHEN FRIEDMAN, WILLIAM W. | : |
| GEORGE, JAMES A. JOHNSON, | : |
| | : |
| Defendants, | : |
| | : |
| and, | : |
| | : DEMAND FOR JURY TRIAL |
| | : |
| GOLDMAN SACHS GROUP, INC., | : |
| | : |
| Nominal Defendant. | : |
| | x |

Plaintiff Michael G. Brautigam ("Plaintiff"), by and through his attorneys, derivatively on

behalf of nominal defendant The Goldman Sachs Group, Inc. ("Goldman" or the "Company"),

submits this Verified Shareholder Derivative Complaint against the Defendants named herein.

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and

upon information and belief developed from the investigation and analysis of his counsel.

## I. SUMMARY OF THE ACTION

1.     The factual allegations set forth below are based on a review by Plaintiff's

counsel of thousands of pages of the Company's internal documents that the United States

Permanent Subcommittee for Investigations ("Subcommittee") published on or about April 13,

2011 in connection with its report entitled *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse.*

      2.     As alleged more particularly below, the Individual Defendants named in this Complaint had knowledge of the Company's Mortgage Department's use of "structured exits" designed to transfer risks of losses associated with its long investments in a variety of mortgage assets and the fact that the structured exits created actual conflicts between the Company's and its clients' interests. But, during the Relevant Period (January 2008 through April 13, 2011) the Individual Defendants concealed the fact that such conflicts actually transpired in connection with the structured exits and caused the Company to file and publish Forms 10-K and Annual Reports wrongfully disclaiming that such conflicts could occur when they already had.

      3.     By the late summer of 2006, the Company held billions of dollars of subprime mortgage-related assets on its balance sheet, including investments in the ABX Index [1], residential mortgage backed securities ("RMBS") [2], and residential mortgage loans awaiting securitization. Appreciation of the values of these assets depended on continued appreciation of the subprime-related markets. In other words, they were for the most part "long" investments.

      4.     Company executives (including Defendant Blankfein, Defendant Cohn, Defendant Viniar) realized they or others under their supervision and direction had miscalculated the direction of subprime-related markets – namely, subprime fundamentals had- and were expected to continue to- deteriorate – and that the Company stood to incur massive losses on its long investments. As Jonathan Sobel (the head of the Mortgage Department during 2006)

---

[1] The ABX index tracked the performance of- and its value depended on- twenty subprime residential mortgage backed securities.

[2] RMBS securities were created by bundling large numbers of home loans into a loan pool, designing a "waterfall" that delivered a stream of revenue from those loans in sequential order to a series of "tranches" and, in turn, to investors who purchased securities linked to specific tranches.

conveyed to Defendant Viniar and other senior executives on the Company's Firmwide Risk Committee ("FWRC") in August 2006, the ABX Index had "run its course" and the Mortgage Department would "reduce exposures." During late 2006 through 2007, meetings of the FWRC were held weekly, were frequently attended by Defendant Blankfein and Defendant Cohn, and when they or other senior executives were unable to attend the minutes indicated their absence by noting "apologies received."

5.     No later than August 2006, senior executives instructed the Company's Mortgage Department to reduce risks of losses on the long investments. But by the fall of 2006, senior executives learned that the Mortgage Department encountered significant difficulty carrying out their instructions by simply selling certain large holdings.

6.     As the Mortgage Department labored during the fall of 2006 through fiscal 2007 to carry out these instructions, the Company's three employee directors (Defendant Blankfein, Defendant Cohn, and Jon Winkelried), its then-Chief Financial Officer and now a director (Defendant Viniar), the Company's FWRC, and its outside directors (including Defendant Dahlback, Defendant Friedman, Defendant George, and Defendant Johnson) were continually apprised of the Department's activities. This fact is confirmed by: numerous internal emails among the Mortgage Department head, Defendant Blankfein, Defendant Cohn, Defendant Viniar, employee director Jon Winkelried, and other senior executives; specific Mortgage Department presentations to Defendant Cohn, Defendant Viniar, and to the Board; the Company's internal reporting and governance systems; and the talking points (copied to in house counsel Kenneth Josselyn) prepared by the Company's Chief Risk Officer (Craig Broderick), its Chief Accounting Officer and Controller (Sarah Smith), and its Global Head of Market Risk

3

(Robert Berry) for their November 14, 2007 meeting with the United States Securities and Exchange Commission ("SEC") and other regulators stating, for example,

    a. "sr mgmt. participated actively in all of the significant exposure management including decisions on when / how to reduce positions",

    b. "[d]ecisions regarding e.g. short positions in mortgages taken by business units but with full knowledge of the 30th floor" (the location of the Company's most senior executives' offices),

    c. that there were at least three specific mortgage presentations to the Board and another to be made the following day, and

    d. that the Mortgage Department's activities were discussed at each weekly FWRC meeting "attended by DViniar and GCohn, and often LBlankfein".

7. In September 2006 Mr. Sobel reported to Defendant Viniar and the FWRC that the Mortgage Department was jettisoning its ABX Index investments and simultaneously securitizing mortgages in its inventory for sale to clients. This coincident unloading of the Company's long ABX Index investments and securitization efforts was a red flag signaling that the Company's and its clients' interests would conflict unless proprietary trading was executed consistent with the Company's internal policies embodied in its Code of Business Conduct and Ethics and elsewhere.

8. Mr. Sobel also reported in September to Defendant Viniar and the FWRC that the Mortgage Department was working new issuances of structured products securities known as collateralized debt obligations ("CDOs" [3]) as an "exit for our long ABX risk." This reported

---

[3] Cash CDOs were securities backed by a portfolio of fixed income assets such as securitized mortgage loans. Synthetic CDOs, in contrast, did not actually own any income-producing assets, but mimicked cash flows of referenced assets by means of a transaction called a credit default

ABX exit strategy was another red flag because it meant just one thing – namely, that the Mortgage Department would attempt to offset the Company's risks of loss on its ABX investments by making short investments related to CDOs that it structured and sold to clients by purchasing insurance (i.e., CDSs) that would pay off when the underlying assets (i.e., ABX and RMBS investments) declined in value. Several reports were made to Defendant Viniar, Defendant Cohn, Defendant Blankfein, members of the FWRC, and/or to the Board concerning the progress and success of the ABX exit strategy. The relevant CDO structured and sold to Company clients to accomplish this transfer of risk of loss on ABX investments was Hudson Mezzanine Funding 2006-1 ("Hudson").

9. Defendant Viniar issued an order in December 2006 to "be aggressive distributing things because there will be very good opportunities as the markets goes into what is likely to be even greater distress and we want to be in position to take advantage of them[]", and the Mortgage Department devised a means to transfer the Company's risks of losses associated with its long investments in subprime mortgage assets held in "warehouse" accounts awaiting securitization. Many of these loans were originated by subprime lenders (*e.g.*, New Century, Fremont, and others) that were internally known to originate poor quality mortgage loans, as evidenced by increasing rates of early payment defaults ("EPDs") by homeowners, instances of fraud when those loans were originated, and adverse financial events associated with those originators. While the Mortgage Department was actively marking down the value of such loans and/or demanding that originators repurchase such loans ("putting back"), all as known to the

---

swap ("CDS"). A CDS functioned like a credit insurance agreement covering a referenced asset: one party, the "credit protection buyer," paid a premium in exchange for a promise that the other party, the "credit protection seller," would make an insurance payout if the asset experienced a "negative credit event" such as a payment default or a credit rating downgrade. Synthetic CDOs allowed investors to assume the position of credit protection seller, anticipating that the referenced assets would not experience a negative credit event.

Individual Defendants, simultaneously structured and sold at least one CDO whose value depended on subprime loans originated by those same lenders. Several presentations concerning deterioration in values of New Century - and Fremont - originations were made to Defendant Viniar, Defendant Cohn, employee director Winkelried, members of the FWRC, and/or the Board concerning reductions of risks of loss related to the Company's unsecuritized subprime investments. The relevant CDO here was Anderson Mezzanine Funding 2006-1 ("Anderson").

10.     Lastly, to minimize losses to the Company in connection with ongoing deterioration in values of other CDO assets being held for securitization, another CDO was rushed to market ahead of schedule and was internally known to be one of most concern. By this time, CDO sales had slowed, CDO markets lacked transparency and liquidity, and the Mortgage Department was actively marking down values of its long CDO assets. Defendant Cohn and Defendant Viniar directed and were apprised of these projects when this third CDO was being marketed and sold to non-traditional clients at prices exceeding internal values. The relevant CDO for this purpose was Timberwolf I ("Timberwolf"). Management Committee member Thomas Montag, the head of the Company's Fixed Income Currency and Commodities unit (including the Mortgage Department), reflected during the marketing and sale of Timberwolf, "boy that timeberwof [sic] was one shitty deal."

11.     Hudson, Anderson, and Timberwolf were structured such that the Company was the largest single short investor, but as the Subcommittee found, their marketing and offering materials did not disclose that this decision had already been made. The Subcommittee also found that the materials and other advice given to clients concealed the fact that these CDOs were structured to offset risks of losses on the Company's balance sheet investments, included false statements about the strength of certain subprime originators, and concealed differences

6

between the Mortgage Department's internal valuations of unsold securities and the prices at which it sold them to clients.

12.     Because Hudson, Anderson, and Timberwolf involved the Company's capital commitments, because they were new products, because they were structured products, and/or they implicated reputational issues, they were subject to the review and approval by one or more of the Company's committees, including its Firmwide Capital Committee co-chaired by Defendant Viniar, all of which reported to the Company's Management Committee. Defendant Blankfein, Defendant Cohn, Defendant Viniar, Mr. Montag, and employee director Jon Winkelried were all members of the Management Committee.

13.     As the Subcommittee concluded, instead of disclosing the conflicts of interest inherent in these products, the Company marketed and sold these CDOs by making false or misleading statements concerning, among other things, the existence and size of the Company's short investments. Moreover, as this Court found in its order denying in part a motion to dismiss filed by Defendant Blankfein, Defendant Cohn, Defendant Viniar (all of whom were deemed control persons of the Company) and the Company in a related securities fraud action, the "no conflict" disclaimers set forth in the Company's SEC filings were materially false or misleading because actual conflicts in connection with these CDOs already existed.

14.     As a result, the Company's reputation has suffered, it has been publicly vilified, it has incurred significant expenses related to the Subcommittee's and others' investigations, its market capitalization has eroded, and now it faces potentially huge financial liability in connection with class action securities fraud litigation (*i.e.*, *Richman v. Goldman Sachs Group, Inc., et al.*, No. 10-Civ-3461 (PAC) (S.D.N.Y.)) and individual civil fraud actions brought by clients who purchased the CDO securities. (*Dodona I, LLC v. Goldman Sachs & Co., et al.*, No.

10-Civ-7497 (VM) (S.D.N.Y.) and *Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc., et al.*, Index No. 652996/2011 (N.Y. Supr. Ct.), respectively).

## II. JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs. This action is not a collusive one intended to confer jurisdiction on a court of the United States that the Court would otherwise lack.

16.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including all or primarily all of Defendants' participation in the wrongful acts detailed herein, occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## III. PARTIES

17.     Plaintiff, Michael G. Brautigam, as set forth in the accompanying verification, is and was at all relevant times, a shareholder of nominal defendant Goldman Sachs, Inc. He is a citizen of the state of Ohio.

18.     Nominal Defendant Goldman is a Delaware corporation with its principal executive offices located at 200 West Street, New York, New York. Goldman is a full services global financial institution organized as a bank holding company and a financial holding company regulated by the Federal Reserve Board, which provides securities related services to a diverse client base including corporations, governments, and other financial institutions, and individuals. During 2006 and 2007, the Company's operations were divided into three segments: Investment Banking, Trading and Principal Investments; and Asset Management and Securities

8

Services. The Trading and Principal Investments segment was divided into three businesses: Fixed Income, Currency and Commodities ("FICC"); Equities; and Principal Investments. FICC had five principal businesses, including the Mortgage Department. The Mortgage Department was responsible for trading virtually all of the Company's mortgage-related assets. It originated and invested in residential and commercial mortgage backed securities; developed, traded and marketed structured products and derivatives backed by mortgages; and traded mortgage market products on exchanges. During the Mortgage Department's structuring, marketing and sales of the Hudson, Anderson, and Timberwolf securities, Thomas Montag headed the FICC unit.

19. Defendant Lloyd C. Blankfein has been Chairman and Chief Executive Officer ("CEO") of Goldman since June 2006 and a director since April 2003. He is a member of the Company's Management Committee. As an employee director, he was required to keep the Board accurately informed of all material information pertaining to Mortgage Department activities (including its structured exits) pursuant to Company policies embodied in its Code of Business Conduct and Ethics. Previously, he was President and Chief Operating Officer ("COO") since January 2004. Prior to that, from April 2002 until January 2004, he was a Vice Chairman of Goldman Sachs, with management responsibility for Goldman' FICC and Equities Divisions. Prior to becoming a Vice Chairman, he had served as co-head of FICC since its formation in 1997. From 1994 to 1997, he headed or co-headed the Currency and Commodities Division. On information and belief Mr. Blankfein is a citizen of New York.

20. Defendant Gary D. Cohn has been President and Chief Operating Officer ("COO") of Goldman since April 2009 and a director since June 2006. He is a member of the Company's Management Committee. As an employee director, he was required to keep the Board accurately informed of all material information pertaining to Mortgage Department

activities (including its structured exits) pursuant to Company policies embodied in its Code of Business Conduct and Ethics. Defendant Cohn previously was President and Co-COO of Goldman from June 2006 through March 2009. Previously, he had been the co-head of Goldman Sachs' global securities businesses since June 2004. He also had been the co-head of Equities since 2003 and the co-head of FICC since September 2002. From March 2002 to September 2002, he served as co-COO of FICC. Prior to that, beginning in 1999, he managed the FICC macro businesses. From 1996 to 1999, he was the global head of Goldman Sachs' commodities business. On information and belief Mr. Cohn is a citizen of New York.

21.     Defendant David Viniar became a director of the Company in January 2013. Prior to that he served as Executive Vice President and Chief Financial Officer ("CFO") from May 1999 until his retirement during 2012. He was a member of the Company's Management Committee. As the Company's CFO, he was required to keep the Company's Audit Committee accurately informed of all material information pertaining to Mortgage Department activities (including its structured exits) pursuant to Company policies embodied in its Code of Business Conduct and Ethics. Since December 2002, he has headed Goldman's Technology, Finance and Service Division. He was the head of the Finance Division and co-head of Credit Risk Management and Advisory and Firmwide Risk from December 2001 to December 2002. Mr. Viniar co-headed Operations, Finance and Resources from March 1999 to December 2001. He was CFO of The Goldman Sachs Group, L.P. from March 1999 to May 1999. From July 1998 until March 1999, he was Deputy CFO and from 1994 until July 1998, he was head of Finance, with responsibility for Controllers and Treasury. From 1992 to 1994, he was head of Treasury and prior to that was in the Structured Finance Department of Investment Banking. Upon information and belief Mr. Viniar is a citizen of New York.

22.     Defendant Claes Dahlback has served as a director of the Company since June 2003 and is a member of all standing committees of the Board. In connection with his service on the Audit Committee during 2007, that Committee met ten times including five executive sessions and five private sessions with each of management, the independent auditors, and the Director of Internal Audit. On information and belief, Mr. Dahlback is a citizen of Sweden.

23.     Defendant Stephen Friedman has served as a director of the Company since April 2005, is a member of all standing committees of the Board, and chairs its Risk Committee. In connection with his service on the Audit Committee during 2007, that Committee met ten times including five executive sessions and five private sessions with each of management, the independent auditors, and the Director of Internal Audit. Mr. Friedman was previously employed by the Company and is a retired Chairman of the Company. On information and belief, Mr. Friedman is a citizen of New York.

24.     Defendant William W. George has served as a director of the Company since December 2002 and is a member of all standing committees of the Board. In connection with his service on the Audit Committee during 2007, that Committee met ten times including five executive sessions and five private sessions with each of management, the independent auditors, and the Director of Internal Audit. On information and belief, Mr. George is a citizen of Massachusetts.

25.     Defendant James A. Johnson has served as a director of the Company since May 1999, is a member of all standing committees of the Board, and chairs its Compensation Committee. In connection with his service on the Audit Committee during 2007, that Committee met ten times including five executive sessions and five private sessions with each of

11

management, the independent auditors, and the Director of Internal Audit. On information and

belief, Mr. Johnson is a citizen of Idaho.

## IV.  SUBSTANTIVE ALLEGATIONS

**A.      Company Policies Relevant To This Action.**

26.     At all relevant times, the Individual Defendants and employees under their

supervision were subject to the following Company policies.

27.     All Company personnel (and Board members) were required to comply with the

Code of Business Conduct and Ethics, which purportedly:

> [...] embodies the firm's commitment to conduct our business in accordance with
> the highest ethical standards and in compliance with all applicable laws, rules and
> regulations.  The Code applies to all of our people, including members of our
> Board of Directors.
>
> * * *
>
> **Fair and Ethical Competition**
> We rely on our people to uphold our culture of integrity in all that we do.  Our
> values demand that we deal fairly with our clients, service providers, suppliers,
> competitors and each other.  **No one at the firm may seek competitive
> advantage through illegal or unethical business practices.  Taking unfair
> advantage of anyone through manipulation, concealment, abuse of privileged
> information, misrepresentation of material facts, or any unfair dealing
> practices is a violation** of this Code.
>
> * * *
>
> **Public Disclosure**
> It is our policy that **all information in our public communications – including
> SEC filings – be full, fair, accurate, timely and understandable.**  All
> individuals who are involved in our disclosure process must act in a manner
> consistent with this policy.  In particular, **they are required to maintain
> familiarity with the relevant disclosure requirements, and are prohibited
> from knowingly misrepresenting, omitting, or causing others to misrepresent
> or omit, material facts about the firm to others, whether within or outside the
> firm,** including our independent auditors.

28.     Communications to clients and the public (including those pertaining to Hudson, Anderson, and Timberwolf) were subject to the Company's Policies for the Preparation, Supervision, Distribution and Retention of Written And Electronic Communications, which provided in part:

> Goldman Sachs communicates with its customers (including private individuals, institutions and other broker/dealers), counterparties, and the general public in many ways. **The integrity of these communications is essential to the firm's reputation and success.** Therefore, with this manual, the firm is setting forth its policies regarding the preparation, supervision, distribution and retention of all written and electronic communications relating to our business.

* * *

> **Truthfulness and Completeness**
>
> **Communications may not omit material facts or include untrue or misleading statements.** Keep in mind that the level of detail or explanation necessary to make a communication clear, accurate, and understandable will depend, in part, on the breadth and sophistication of the intended audience and the complexity of the subject matter. For example, communicating complicated material or the lack of financial sophistication of the recipient will often warrant a more detailed presentation.

* * *

> **Suitability of Recommendations Made to Customers**
>
> **Prior to recommending that a customer purchase, sell or exchange any security, salespeople must have reasonable grounds for believing that the recommendation is suitable** for that particular customer upon the basis of the facts disclosed by the customer as to his/her other security holdings, investment objectives and financial situation.

29.     Mortgage trading desk personnel were also subject to the *Mortgages Compliance Training 2007 Trading Desks Manual* which required:

> -   Our first business principle states that:
>
> *Our Clients' Interest Always Come First*

* * *

- Trading and sales personnel have an obligation to "know their customers" before recommending or entering into any securities transaction

- Learn the essential facts about the customer and the customer's orders and accounts

- All recommendations to a customer must be suitable and appropriate for the customer

- The salesperson should know as much as possible about the customer's objectives, strategies, tolerance for risk, and the type of information the customer is relying on

**B.** **Following The Conclusion That The ABX Index "has run its course", Structured Exits Begin.**

30.    In mid - to late - 2006, the Company's management realized that the market for subprime mortgage backed securities was beginning to decline, and that the large long positions it held in ABX assets, loans, RMBS and CDO securities, and other mortgage related assets posed a disproportionate risk to both the Mortgage Department and the Company.

31.    By summer 2006, the Mortgage Department owned (was long) several billion dollars in ABX, RMBS, CDO, and other mortgage related assets in the Company's investments and sale inventories and in its CDO warehouses.

32.    As set forth in the August 9, 2006 Firmwide Risk Committee ("FWRC") minutes, the then-head of the Mortgage Department, Jonathan Sobel, informed Defendant Viniar and other senior executives that ABX "has run its course" and the Mortgage Department would "reduce exposures." These minutes state that "apologies were received from Gary Cohn," but not from Defendant Blankfein (indicating that he was present).

33.    On September 9, 2006, Mr. Sobel updated Defendant Viniar and other members of the FWRC about Mortgage Department activities. The minutes state that he reported that the Department was trying to jettison its ABX investments and securitize mortgages for sale to

14

clients: "continuing to reduce volatile ABX position" and "[s]ecuritization calendar picking up next week." This was an early red flag to senior executives warning that there could be conflicts between the Company's and its clients' interests. These minutes do not state that "apologies were received" from either Defendant Blankfein or Defendant Cohn.

34.     Because the Mortgage Department was having difficulty selling outright its long ABX investments, Mr. Sobel directed the head of the Mortgage Department's Structured Products Trading Group on September 19, 2006, "[w]e need to reach a conclusion on the viability of a structured exit" and Mr. Sobel's successor Daniel Sparks asked the head of the CDO Origination Desk "if there was something [the CDO desk] could do with ABX." That evening these and other managing directors met to discuss ABX structured exit opportunities and decided to construct a CDO. They advised Mr. Sobel, "[p]roceeding with the CDO solution, the CDO team has 60 single-names that they will be able to begin to build a deal around."

35.     The next day, Mr. Sobel informed Defendant Viniar and other members of the Company's FWRC[4] that the CDO Origination Desk was working on the "first ever" ABX CDO that would function as an exit for the Company's long ABX investments. Given the Mortgage Department's inability to simply sell its long ABX investments, Mr. Sobel's report meant just one thing – namely, the Mortgage Department would structure and sell this CDO to Company clients such that the Company would retain the short side of the trade (*i.e.*, bet on a fall of the

_____

[4] Defendants Blankfein and Cohn regularly attended FWRC meetings. As senior officers Craig Broderick (Chief Risk Officer), Sarah Smith (Chief Accounting Officer and Controller) and Robert Berry (Global Head of Market Risk) informed the SEC and other regulators: (a) "sr mgmt. participated actively in all of the significant exposure management including decisions on when/how to reduce positions…" and (b) "[d]ecisions regarding e.g. short positions in mortgages taken by business units but with full knowledge of the 30th floor." The reference to the "30th floor" was to where in the Company's headquarters its most senior executives (including Defendants Blankfein, Cohn, and Viniar and employee director Winkelried) maintained their offices.

relevant ABX indices).   As such, it was a red flag to Defendant Viniar and other senior executives signaling that proper execution of this exit trade depended on strict adherence to the Company's Code, its Communications Policies, its Mortgage Compliance Manual, and applicable positive law.

36.     Because this was "the first ever" ABX CDO, and was intended to transfer risks away from the Company, Company policy required that it be reviewed and approved by certain committees in addition to the FWRC.[5]  These included one or more of the following:

a.  The Business Practices Committee was responsible for assisting Goldman's senior management in the oversight of compliance and operational risks and related reputational concerns, sought to ensure the consistency of the Company's policies, practices and procedures with its Business Principles, and made recommendations on ways to mitigate potential risks.

b.  The Firmwide Capital Committee (headed by Defendant Viniar and Chief Administrative Officer Edward Forst) reviewed and approved transactions involving commitments of the Company's capital.  These included, but were not limited to, extensions of credit, alternative liquidity commitments, bond underwritings and distressed debt and principal finance activities.  The Firmwide Capital Committee was also responsible for establishing business and reputational standards for capital commitments and sought to ensure that they were maintained on a global basis.

---

[5] All of these Committees ultimately reported to the Management Committee, which included Defendant Blankfein, Defendant Cohn, Defendant Viniar, employee director Winkelried, and other senior executives.

c. The Commitments Committee reviewed and approved underwriting and distribution activities and set and maintained policies and procedures designed to ensure that legal, reputational, regulatory and business standards were maintained in conjunction with those activities.   In addition to reviewing specific transactions, the Commitments Committee periodically conducted strategic reviews of industry sectors and products and established policies in connection with transaction practices.

d. The New Products Committee, under the oversight of the Firmwide Risk Committee, was responsible for reviewing and approving the Company's new products and businesses globally.

e. The Operational Risk Committee oversaw the ongoing development and implementation of the Company's operational risk policies, framework and methodologies, and monitored the effectiveness of operational risk management.

f. The Structured Products Committee reviewed and approved the Company's structured product transactions entered into with its clients that raised legal, regulatory, tax or accounting issues or presented reputation risk to the Company.

37.    This "first ever" ABX CDO became known as Hudson Mezzanine 2006-1 (Hudson), a $2 billion synthetic CDO comprised of $1.2 billion in ABX assets from Goldman's own inventory and $800 million in single name CDS contracts on subprime RMBS and CDO securities that the Mortgage Department wanted to short.  It was called a "mezzanine" CDO, because the referenced RMBS securities carried the riskier credit ratings of BBB or BBB-.  The Mortgage Department used the CDO to transfer the risk associated with its ABX assets to investors who bought Hudson securities.  Goldman also took 100% of the short side of the CDO,

which meant that it would profit when (as internally expected) any of the assets underlying Hudson securities lost value. In addition, Goldman exercised complete control over the CDO by playing virtually every key role in its establishment and administration, including the roles of underwriter, initial purchaser of the issued securities, senior swap counterparty, credit protection buyer, collateral put provider, and liquidation agent.

38. However, as discovered by the Subcommittee, the Mortgage Department did not fully disclose to potential investors material facts related to Goldman's investment interests, the source of the CDO's assets, and their pricing. The marketing materials stated prominently, for example, that Goldman's interests were "aligned" with investors, because Goldman was buying a portion of the Hudson equity tranche. The marketing materials did not disclose, however, that the Company would also short all $2 billion of Hudson's assets – an investment that far outweighed its $6 million equity share and which was directly adverse to the interests of prospective investors. In addition, the marketing materials stated that Hudson assets were "sourced from the Street" and that it was "not a balance sheet CDO" even though $1.2 billion of the Hudson assets had been selected solely to transfer risks of loss from ABX assets held in the Company's inventory.

39. The Subcommittee also found that the Mortgage Department also did not disclose in the materials that it had priced the assets without using any actual third party sales. The absence of arm's length pricing was significant, because the Hudson CDO was designed to short the ABX Index using single name RMBS securities, and there was a pricing mismatch between the two types of assets. Goldman not only determined the pricing for the RMBS securities purchased by Hudson, but retained the profit from the pricing differential. The marketing

18

materials did not inform investors of Goldman's role in the pricing, the pricing methodology used, or the gain it afforded to Goldman.

40.    Management Committee members Montag and others actively monitored the Mortgage Department's progress on Hudson and other structured products exits. On October 24, 2006, in response to a progress report on Hudson, Montag wrote to Messrs. Sobel and Sparks: "great on the [sic] this CDO getting rid of our ABX risk[] when is the next one? Lets be aggressive – when we are down 50% in risk then we can be pickier about making money...let me know". He also wrote: "...I just heard some chatter about people trying to make money out of the cdo and slowing down the process etc and I think myself and others think we need to be less nickel and dime and more dollar based in reducing the risk."

41.    By October 25, 2006, Mr. Sobel updated Defendant Viniar and Defendant Cohn on the progress of the Hudson ABX exit: "1.6bn of the $2bn sold.... Equity more than 85% sold." The next day, one of the Company's risk officers reported to Defendant Blankfein, Defendant Cohn, employee director Winkelried, and others that "[r]isk reduction is primarily due to pricing of $2bn Hudson Mez synthetic CDO deal...." Thus, these individuals were directly informed that the Hudson structured exit reduced risks of losses that could only be accomplished by the Company retaining a large short investment against those securities.

42.    During early December 2006, Management Committee member Montag again voiced his impatience with the Mortgage Department's execution of the instruction to get rid of risks of losses. On December 7, 2006, Sparks assured him "[s]tructured exits are complicated and take time" and "team is pushing hard on structured outs."

43.    Also on December 7, Mr. Sparks reported to Defendant Cohn, Defendant Viniar, Montag, and others that "[g]enerally originators are struggling with EPDs (early payment

19

defaults) which require them to buy back loans and take losses.... Our other funded warehouse lines are $281mm funded to Accredited...$126MM to New Century...."

## C.    Continued Stress in the Subprime Markets.

44.    On December 13, 2006, after Hudson closed, Mr. Sparks reported to Defendant Viniar and the FWRC and noted the stress in the subprime market, serious problems with (and failures of) subprime originators, the Mortgage Department's concern around early payment defaults, and other risks of loss pertaining to subprime positions. The minutes of this meeting indicate that Defendant Cohn was present.

45.    On December 14, 2006, as Goldman's mortgage related assets continued to lose value, Defendant Viniar held a meeting with Mr. Sparks and other key Mortgage Department personnel, representatives from Market Risk Management & Analysis, and representatives from the Controllers group to conducted an in-depth review of the Mortgage Department's holdings.

46.    Mr. Sparks reported to Mr. Montag later that day that he, Defendant Viniar, and the other participants reviewed in detail six areas of risks of loss (ABX/CDS, loans, residual investments, early payment defaults, and loans waiting to be securitized). He also reported steps that the Mortgage Department was taking or would take, including selling ABX investments, distributing as much as possible on bonds created from new loan securitizations, unloading residual investments, and staying focused on subprime originators from whom the Department purchased loans.

47.    Also in December 2006, Defendant Viniar instructed the Department to "get closer to home." By "closer to home," he meant for the Mortgage Department to assume a more neutral risk position, one that was neither substantially long nor short. As he told Montag, "my basic message was let's be aggressive distributing things because there will be very good

20

opportunities as the markets goes into what is likely to be even greater distress and we want to be in position to take advantage of them...."

48.    In early January 2007, Defendant Viniar met with the Company's Credit Risk Management & Advisory group and discussed risks of loss related to warehouse lending, whole loan purchases (sub-prime), and whole loan exposures (EPDs). Among the top ten EPD risks discussed were to subprime originators Fremont and New Century.

49.    The January 9, 2007 Mortgage Department Update provided to senior management highlighted primary risk of loss mitigation including with respect to assets held in CDO warehouse accounts awaiting securitization that the Mortgage Department would, as it did in Hudson, structure exits involving buying CDSs on the CDOs (i.e., shorting) and that Timberwolf was in the CDO pipeline.

50.    On February 2, 2007, Mr. Sparks reported to Defendant Viniar, Richard Ruzika (one of Mr. Sparks' superiors who began to assist the Mortgage Department's efforts), Management Committee member Montag and others that the Mortgage Department was putting back subprime loans to originators (including New Century and Fremont) due to fraud at origination. He also noted that the Department would write down the values of its investments based on certain loan performance data, "and it is horrible." He further reported, "[f]ocus is cleaning out rated bond positions, and the put back process. Sorry for the bad news." With respect to fraud at origination, Sparks explained to the group, "We'll be sorting through all the potential breaches of reps and warranties, and fraud at origination (appraisal, income, occupancy) would be a likely one. Fraud is usually borrower, appraiser or broker fraud – not necessarily by the seller of the loan to us. But generally for reps & warranties the loan seller is responsible if fraud happened. The put backs will be a battle."

21

51.     Defendant Cohn continued to monitor the Mortgage Department's activities. When he asked Mr. Ruzika on February 5, 2007, "Are you living Mortgages". Mr. Ruzika responded:

> Yes.... The business is unfortunately being overshadowed by our ABX position and our sub prime exposure, so it feels bad right now. You know and I know this position was allowed to get too big – for the liquidity of the market, our infrastructure, and the ability of our traders. That statement would be the same even if we had gotten the market direction correct.... I have a working model of the risk program which we are using for our sub prime risk – the first that they've had.

52.     A few days later, on or about February 8, Mr. Sparks reported to Defendant Cohn, Defendant Viniar, employee director Winkelried, and Management Committee member Montag:

> Subprime environment – bad and getting worse. Everyday is a major fight for some aspect of the business (think whack-a-mole). Trading position has basically squared but has basis risk – plan to play from short side. Loan business is long by nature and goal is to mitigate. Credit issues are worsening on deals and pain is broad (including investors in certain GS-issued deals)....

He also reported that there was negative news concerning New Century and that there would be a markdown in values of certain loans being held for securitization:

> Winks [employee director Winkelried] asked whether we were in front on the marks or chasing them down. We have been chasing them down based on loan performance data as it comes out. There will probably be another mark down today in our $800mm scratch-and-dent book...that product has been trading at levels from originators to dealers at levels above our marks, but monthly performance analysis completed this morning on what can be securitized vs will be foreclosed tells us we should mark down around $22mm.

When Defendant Cohn asked for an update later that day, Mr. Sparks informed him "Just finished with trader and controllers.... Agreed that appropriate mark down would be $28.4mm (a lot of change from $22mm this morning is not writing up a residual)."

53.     The same day, an internal email to FICC sales (supervised by Montag) entitled "2006 Subprime 2nds Deals Continue to Underperform" explained widely applicable

deteriorating market trends, the Company's outlook that "[t]he vast majority, if not every 2006 Subprime ...deal (across all originators and shelves), is likely to experience some form of downgrade in their life, and potentially sub-bond writedowns", "[s]ubprime originators, large and small, has exhibited a notable increase in delinquencies and defaults, however, deals backed by Fremont and Long Beach collateral have generally underperformed the most." The report also highlighted New Century and other primary issuers.

54. The next day, Mr. Sparks reported again to Defendant Cohn, Defendant Viniar, employee director Winkelried, and others concerning estimated losses and the Company's investments. "SPG [Structured Product Group] trading has significant single name shorts vs the ABX longs.... The desk is also short single A CDOs." Defendant Cohn responded, "Thanks very helpful."

55. Defendant Blankfein and employee director Winkelried also continued to monitor the Mortgage Department's activities. On February 11, 2007, Montag forwarded a summary of losses pertaining to the Company's holdings of whole loans, estimated losses on unsold CDO assets, and loss mitigation steps (*e.g.,* selling newly issued bonds at any price and moving bonds from old deals to secondary trading desks for sale). Defendant Blankfein responded, "are we doing enough right now to sell off cats and dogs in other books throughout the division".

56. Defendant Cohn learned from Mr. Sobel on February 12 that the two risks of loss of concern were related to the Company's ABX and CDO warehouse and other assets. Mr. Cohn forwarded Mr. Sobel's email to Defendant Viniar the following day.

57. Additional examples of Defendant Cohn's, Defendant Viniar's, Defendant Blankfein's, and employee director Winkelried's continued monitoring of the Mortgage Department include:

a. Management Committee member Montag's February 11, 2007 email to Defendant Blankfein in response to his question about selling "cats and dogs" held by the Mortgage Department explaining "Should we have done that before? Most likely…. One of first [sic] things I did do is push them to move residuals out of origination [desk] and into traders. That had started well before this….";

b. Mr. Ruzika's February 13, 2007 email to Defendant Cohn (who forwarded it to Defendant Blankfein and employee director Winkelried) explaining that shorting subprime assets helped to stablilize risks of loss and "actually make some money back" and that he was working with Mr. Sparks to determine what mortgage assets needed to be "proactively written down" that fiscal quarter;

c. Mr. Sobel's February 13 email to Defendant Cohn (forwarded by him to Defendant Viniar) reiterating "Risk that concerns me is basis between ABX and single names as well as some CDO positions….";

d. Mr. Sparks' February 14 email to Defendant Cohn, Defendant Viniar, employee director Winkelried, and Management Committee member Montag entitled "Post" (which Defendant Cohn forwarded to Defendant Blankfein) in which Mr. Sparks reported:

Over the last few months, our risk reduction program consisted of:
(1) selling index outright
(2) buying single name protection
(3) buying protection on super-senior portions of the BBB/BBB- index…. We thought that the correlation of tranches on the very thin BBB- index was higher than where the market implied. We sold around $3 billion in the mid-30's bp range.

Today is the first day of tranched ABX trading (TABX). We are getting greater transparency on the super-senior layer. The market is opening up in BBB-'s around +200bps. We currently have our trades from (3) above marked in the 100bp area.

That is good for us position-wise, bad for accounts who wrote that protection…, but could hurt our CDO pipeline position as CDOs will be harder to do.

> e. Mr. Sparks' February 21 email to employee director Winkelried explaining "its getting messy" and "[b]ad news everywhere…We are net short, but mostly in single name CDS" and his report later that day to Defendant Cohn, Defendant Viniar, employee director Winkelried, and others that "Market sold off significantly" and "We covered over $400mm single names – still significant work to do";

> f. Mr. Viniar's response to Mr. Sparks on February 21, "Good start. Keep covering."

> g. Mr. Sparks' February 23, 2007 email to Defendant Cohn, Defendant Viniar, employee director Winkelried, reporting.

As CDOs are getting hurt, the CDO warehouse is the position that is the one of potential concern. The key is to find super-senior protection providers for the remaining deals. The largest remaining deals are 2 CDOs of single A rated CDOs and 2 high grade CDOs (no subprime BBB exposure). We have CDO CDS shorts for protection, but deal execution is key.

> h. Mr. Berry's February 24 email to Defendant Viniar explaining that the Mortgage Department's risks of daily loss had become disproportionately large relative to the Company's: "VaR [value at risk] for mortgages would jump from 66.8 [million] to 101.2 [million], firmwide from 146.6 [million] to 166.8 [million]";

      i. Mr. Sparks' March 7 email to Defendant Cohn, Defendant Viniar, employee director Winkelried, Management Committee member Montag and others entitled "Originator exposures" reporting:

Rich [Ruzika] and I were catching up. I will send this group another message of our potential large risk areas as further stress happens, and our mitigation plans.

As for the big 3 originators – Accredited, New Century and Fremont, our real exposure is in the form of put-back claims. Basically, if we get nothing back we would lose around $60mm vs our loans on our books (we have a reserve of $30mm) and the loans in the trusts could lose around $60mm (we probably suffer about 1/3 of this in ongoing exposures). The reason it is not clear is that the loans are not worth 0, there is some value, so there are estimates as to what happens on those loans.

Rumor today is that the FBI is in Accredited.

Other big risk areas I will discuss later relate to CDO and loan execution (rating agency or market shutdown), covering single name and index shorts (liquidity), and retained residuals and loan positions (if collateral performance turns worse).

      j. Mr. Sparks' March 8 follow-up email to Defendant Cohn, Defendant Viniar, employee director Winkelried and others entitled "Mortgage risk" informing them:

Just spent tonight negotiating with Accredited – they plan to send us $21mm in the morning.... New Century remains a problem on EPD [early payment default].

Aside from the counterparty risks, the large risks I worry about are listed below:

(1) CDO and Residential loan securitization stoppage – either via buyer strike or dramatic rating agency change.

On the CDO front, we have been locking people at various parts of the capital structure (with a primary focus on the super-seniors – top 50% of the deal), and rushing to get deals rated. We have liquidated a few deals and could liquidate a couple more, and we are not adding risk (we had slowed down our business dramatically in the past 4 months). Our deals break down into 2 $1BB CDOs of A-CDOs (most risky, but good progress), 2 $1BB AA- diversified deals (less downside, less progress), and 4 other various smaller deals. We have various risk sharing arrangements, but deal unwinds are very painful.

For residential loans, we have not bought much lately and our largest pool to securitize is Alt A ($4.3BB). There is also $1.3BB subprime loans and $700mm seasoned seconds. This market is also very difficult to execute in.

(2) Dramatic credit environment downturn.

Scratch & dent loans ($900mm), residuals ($750mm), and less liquid bond positions – if the credit environment significantly worsens, these positions will be hurt by losses, further lack of liquidity and lower prices.

(3) Covering our shorts. We have longs against them but are still net short.

$4BB single name subprime split evenly between A, BBB, BBB- and $1.3BB of A-rated CDOs.

ABX index – overall the department has significant shorts against loan books and the CDO warehouse. The bulk of these shorts ($9BB) are on the AAA index, so the downside is limited as the index trades at 99.

Our shorts in (3) above have provided significant protection so far, and should be helpful for (1) and (2) in very bad times. However, there is real risk that in medium moves we get hurt in all 3 areas.

Therefore, we are trying to close everything down, but stay on the short side. But it takes time as liquidity is tough. And we will likely do some other things like buying puts on companies with exposures to mortgages.

### D. The Structured Exits Continue.

58. As Mr. Sparks directly reported to Defendant Cohn, Defendant Viniar, and employee director Winkelried on the matters set forth above, particularly risks of losses pertaining to CDO warehouse and other assets and problems with New Century and Fremont originated mortgage loans, the Mortgage Department was working on two additional structured exits relevant to this action.

59. Anderson Mezzanine 2007-1 (Anderson) was another synthetic CDO referencing BBB and BBB- rated subprime RMBS securities. The Company was Anderson's placement agent, initial purchaser, collateral put provider, and liquidation agent. It hired another firm founded by former Goldman employees (GSC Partners), to act as the collateral manager. The

Anderson structured product exit involved the Company taking a short position on approximately 40% of the $305 million in assets underlying Anderson. Like Hudson, this CDO was subject to the review and approval of one or more of the committees described above.

60.    Anderson referenced a number of poor quality assets. Those assets were selected by GSC Partners, subject to approval by the Mortgage Department. Over 45% of Anderson's referenced subprime RMBS securities contained mortgages originated by New Century, known to Defendant Cohn, Defendant Viniar, employee director Winkelried, Montag and other senior executives for issuing poor quality loans and which was experiencing financial problems while Anderson was being structured and marketed. As Mr. Sparks earlier informed Defendant Cohn, Defendant Viniar, and employee director Winkelried, the Mortgage Department staff was aware of New Century's problems and the Department was putting back (*i.e.*, returning) substantial numbers of substandard or fraudulent loans purchased from New Century and demanding repayment.

61.    Other assets in the Anderson warehouse were also performing poorly, and on March 16, 2007 the head of the CDO Origination Desk informed the Goldman Sachs International Risk Committee responsible for financing the warehousing of financial assets to be securitized in connection with CDOs and one of the Company's in house counsel (Tim Saunders) that: Anderson priced on March 12, the warehouse ramped amount was $305 million, the Company executed CDS on $300 million, and the warehouse assets had already lost nearly $23 million. Due to Anderson's asset quality problems, Mr. Sparks considered cancelling Anderson,

but then directed its closing using the $305 million in assets already in the warehouse instead of accumulating all of the $500 million in assets initially planned for this CDO.[6]

62. As the Subcommittee discovered, on March 13, 2007, the Mortgage Department provided internal talking points for its sales force pertaining to Anderson, highlighting: "Portfolio selected by GSC. Goldman is underwriting the equity and expects to hold up to 50%...Low fee structure[.]...No reinvestment risk." The talking points did not disclose to potential investor clients, however, the fact that the Company would also be holding 40% of the short investment against Anderson, placing the Company's interests in direct opposition to its clients who purchased long investments in Anderson. They also did not disclose the Company's discomfort with New Century.

63. Also by March 13, the Company completed an internal review of New Century mortgages with early payment defaults that were on the Company's books, finding fraud, material compliance issues, and collateral problems. It found that "62% of the pool has not made pmts" and recommended "putting back 26% of the pool" to New Century for repurchase "if possible."

64. Timberwolf I (Timberwolf) was a $1 billion hybrid CDO [squared] structured product that referenced single-A rated securities from other CDOs. Those CDO securities referenced, in turn, RMBS securities carrying lower credit ratings, primarily BBB. Altogether, Timberwolf referenced 56 unique CDO securities that had over 4,500 unique underlying assets. Goldman served as the CDO's placement agent, initial purchaser, collateral put provider, and liquidation agent. It also hired a hedge fund with former Goldman employees, Greywolf Capital

---

[6] In the same memo, a CDO referred to as "Greywolf" was listed. All of its underlying assets were other CDOs. It priced on March 13, 2007, $950 million of the total $1 billion deal size had been ramped, executed CDS were $879 million, and warehouses losses were $8.75 million. On information and belief, "Greywolf" became known as Timberwolf.

Management, to act as the collateral manager. Greywolf selected the CDO's assets, with Goldman approval. The Timberwolf structured product involved the Company taking a short position on approximately 36% of the $1 billion in assets underlying Timberwolf. Like Hudson and Anderson, Timberwolf was subject to the review and approval of one or more of the committees described above.

65.    Timberwolf's securities began losing value almost as soon as they were purchased and warehoused. In February 2007, Mr. Sparks told Mr. Montag that Timberwolf was one of two deals "to worry about." He also wrote that the assets in the Timberwolf warehouse account had declined so much in value that they had already exhausted Greywolf's responsibility to pay a portion of any warehouse losses, and any additional losses would be Goldman's exclusive obligation.

66.    Leading up to the closings of Anderson and Timberwolf, on March 7, 2007, Mr. Sparks reported to Defendant Viniar and other members of the FWRC that the subprime market's deterioration were accelerating:

- "Game Over" – accelerating meltdown for subprime lenders such as Fremont and New Century.
- The Street is highly vulnerable, potentially large exposures at Merrill and Lehman. Current strategies are to "put back" inventory, where applicable, or liquidate positions.
- The Mortgage business is currently closing down every subprime exposure possible.

                                          * * *

- Hedge funds have been making money in this market, but it is difficult to tell how much others are losing because many CDOs with subprime assets are not MTM [marked-to-market].

These minutes state that "apologies were received from Lloyd Blankfein" but not from Defendant Cohn.

67.    The next day, on March 8, a senior executive (Harvey Schwartz) stated in an email to Mr. Sparks during the Anderson marketing efforts, "Dan, Seems to me...one of our biggest issues is how we communicate our views of the market --- consistently with what the [mortgage] desk wants to execute..." In response, Mr. Sparks warned, "....we have significant positions that we need to move.... I can't overstate the importance to the business of selling these positions and new issues.... [l]iquidity is so light that discretion with information is very important to allow execution and avoid getting run over.... Priority 1 – sell our new issues and cash positions."

68.    Anderson closed and issued its securities on March 20, 2007. The Mortgage Department prioritized selling them and delayed work on another securitization so the sales force could concentrate on promoting Anderson. When potential investor clients expressed concern about the quality of Anderson's underlying New Century-originated assets, the Mortgage Department provided sales representatives with talking points to dispel concerns about the New Century assets. These talking points did not disclose the Company's internal concerns about New Century loans or that it had or would have 40% of the short side of Anderson.

69.    Within a week of Anderson's closing, on March 26, 2007, the Board (including Defendant Blankfein, Defendant Cohn, employee director Winkelried, Defendant Dahlback, Defendant Friedman, Defendant George, and Defendant Johnson, among others) met and received a detailed presentation from Mr. Sparks and other executives entitled "Subprime Mortgage Business."

70.    The presentation's slide 4, entitled "The Subprime Meltdown", depicted a timeline of events including New Century and Fremont problems.

31

71.    Slide 8 of the presentation, entitled "Timeline of Major Events & GS Response", indicates that the Board discussed subprime sector events and the Company's responses from early 2005 through March 26, 2007, including the following events during the third and fourth quarters of 2006 and the first quarter of 2007:

a.  "Significant deterioration in underwriting standards and increased fraud";

b.  "Cash spreads on RMBS widen as certain investors actively targeted subprime synthetics to express negative views on the sector";

c.  "Widespread mortgage originator defaults begin";

d.  "Bids for subprime loans fell below cost to originate and therefore business was no longer profitable";

e.  "Large originators announced accounting restatements or losses, triggering equity market selloff"; and

f.  "Securitization market for subprime slowed significantly [and] market for securities is dislocated".

72.    Slide 8 of the March 26 presentation also indicates that the Board discussed the Mortgage Department's responses to these events, including facts surrounding structured exits:

a.  "Credit department steps up due diligence process on originators, creates watch list, suspends multiple names";

b.  "Residual assets marked down to reflect market deterioration";

c.  "GS reverses long market positions through purchases of single name CDS and reductions of ABX";

d.  "GS effectively halts new purchases of sub-prime loan pools through conservative bids";

e.  "Warehouse lending business reduced";

f.  "EPD [early payment default] continue to increase as market environment continues to soften".

73.     Slide 10 of the March 26 presentation, entitled "GS Subprime Mortgage Business Subprime Risk: Current Position as of 3/15/07," indicates that the Board discussed the Mortgage Department's investments, including:

   a.  Long investments:   $2.9 billion subprime loans, $.5 billion subprime residuals, $3.3 billion Alt-A loans, $.3 billion Alt-A residuals, $1.6 billion cash RMBS, $1 billion cash CDO, $3 billion CDO warehouse assets;

   b.  Short investments:  $5 billion ABX, $3.5 billion RMBS CDS, $2 billion CDO CDS, $2.2 billion ABX.

74.     Slide 11 of the March 26 presentation, entitled "Credit Exposure Summary," indicates that the Board discussed two "Troubled Companies…Fremont and New Century." By this time, Anderson (whose underlying assets included those related to Fremont and New Century originated mortgages) had closed. Thus, the Board's discussion of Fremont and New Century necessarily included the Anderson structured exit (including the Mortgage Department's short). Moreover, because Defendant Blankfein, Defendant Cohn, employee director Winkelried, Defendant Viniar, and Mr. Sparks had direct knowledge of the Mortgage Department's problems with Fremont and New Century holdings, they had an affirmative duty under the Company's Code of Business Conduct and Ethics to advise the other outside directors (*e.g.*, Defendant Dahlback, Defendant Friedman, Defendant George, Defendant Johnson) about this material information impacting risk reduction activities. Such information, particularly the Company's 40% short against Anderson, raised a red flag to the Board signaling that the Company's interests were adverse to those of its clients who were or would be long Anderson investors.

75.     Slide 13 of the March 26 presentation, entitled "Lessons Learned," indicates that the Board discussed "What went wrong" and "What went right." According to the slide, "What went right" included Hudson's successful "ABX exit" (*i.e.*, that "[risk reduction is primarily due

33

to pricing of $2bn Hudson Mez synthetic CDO deal…"). More particularly, Slide 8 indicates that the Board discussed "GS reverses long market positions through purchases of single name CDS and reductions of ABX." Moreover, since these material facts were directly communicated to Defendant Blankfein, Defendant Cohn, employee director Winkelried, Defendant Viniar, and Mr. Sparks, these individuals had an affirmative duty under the Company's Code of Business Conduct and Ethics to advise the other outside directors (*e.g.*, Defendant Dahlback, Defendant Friedman, Defendant George, Defendant Johnson) about this material structured exit strategy. This raised a red flag to the Board signaling that the Company's interests were adverse to those of its clients who were long Hudson investors.

76. In addition, because the Timberwolf warehouse constituted a material portion of the $3 billion of the Company's long warehouse assets, there is every reason to believe that Timberwolf was also discussed on March 26. Mr. Sparks, Defendant Cohn, Defendant Viniar had direct knowledge that the value of Timberwolf warehouse assets posed serious risks of loss. Indeed, Mr. Sparks' reported that "[t]he key is to find super-senior protection providers for the remaining deals." Defendant Cohn, Defendant Viniar, employee director Winkelried were under an affirmative duty under the Company's Code of Business Conduct and Ethics to advise the other outside directors (*e.g.*, Defendant Dahlback, Defendant Friedman, Defendant George, Defendant Johnson) about this material structured exit strategy. This was a red flag to the Board signaling that the Company's interests were adverse to those of its clients who were or would be long Timberwolf investors.

77. Timberwolf nonetheless proceeded to close on March 27, 2007, approximately six weeks ahead of schedule. Almost as soon as the Timberwolf securities were issued, they too began to lose value.

E.    **"Gameplan" And The "Monster" Re-Mark.**

78.    While the Mortgage Department was trying to sell its unsold Hudson, Anderson,

Timberwolf, and other mortgage assets, it was internally reducing their values.

79.    In May 2007, management became concerned that Mr. Sparks' previously

predicted seizure of CDO sales had materialized and resulted in a lack of sales prices to establish

values of the Company's CDOs.  With respect to the Department's attempts to establish values

of Timberwolf securities, one person working on the analysis wrote to the team:

> Here is a spread sheet with our latest info on timberwolf plus some simple
> analysis. I basically default every 2006 vintage subprime regardless of rating, and
> assume losses of 50% of face.  I then lok at those losses versus an adjusted cdo
> credit support to see if there are losses.  This brute force approach defaults 25 of
> the 55 names, or 45%.  This results in a writedown at the timberwolf level of
> 24%....  [T]his framework can provide some rudimentary analysis for us and for
> customers.  Once we send them the spreadsheet with the information they can do
> this them selves [sic].

In response, a senior "stat" assisting the analysis observed in his May 7 email: "[t]he trickiest

part about sharing this analysis with custies [customers] is that it shows just how rudimentary our

own understanding of these positions actually is."

80.    On May 11, 2007, Defendant Cohn and Defendant Viniar met with Mortgage

Department personnel and others to discuss a gameplan for CDO valuation issues.  Mr. Sparks

explained to Mr. Ruzika later that day:

> Cdo positions and market liquidity and transparency have seized. I posted senior
> guys that I felt there is a real issue....  We are going to have a very large mark
> down – multiple hundreds.  Not good.

> We had a meeting today with viniar, don, mcmahon, my team, controllers, gary
> [Cohn] on the phone to walk through the situation....

81.    This plan required the Mortgage Department to use three different valuation

methods to price all of its CDO warehouse assets, unsold securities from past CDOs, and new

securities from CDOs then being marketed to clients. As indicated in a May 14, 2007 internal email, the results of this analysis were being prepared for transmittal via email to Defendant Cohn. During this process, Mr. Schwartz expressed concern regarding the representations being made to the Company's clients and how the Department would price CDO securities after clients purchased them.

82.     On May 20, 2007, Mr. Sparks and others made a presentation to Defendant Viniar. The draft presentation materials highlighted, in part, that "[b]ased upon the inability to place...Timberwolf..., the Mortgage trading desk assessed the current valuation of retained positions and the ability to securitize current CDO [squared] warehouse collateral" and indicated that CDO retained positions and warehouse collateral values should be reduced between $248 million and $511 million, depending upon which of three valuation methods was used. The draft presentation also stated that "[t]he complexity of the CDO [squared] product and the poor demand for CDOs in general has made this risk difficult to sell and the desk expects it to underperform." This material information was required to be conveyed to Defendant Viniar during the meeting pursuant to the Company's Code of Business Conduct and Ethics.

83.     At the same time, internal analyses showed the values of the Timberwolf A2 and B tranches to be between 24 and 66 cents on the dollar and between 15 and 38 cents on the dollar, respectively.

84.     Yet, during the period between May 20 and June 22, the Mortgage Department sold Timberwolf CDO securities to clients such as Basis Capital at prices exceeding internal valuations.

85.     In fact, with respect to at least Timberwolf, the Mortgage Department (as it informed Defendant Viniar on May 20, 2007) worked with the legal department to expand its

36

targeted clients to include Basis Capital and others who they knew were non-traditional CDO investor clients. By expanding targeted clients to include non-traditional investor clients, Defendant Viniar knew that the Mortgage Department embarked on a path that could violate Company policies (e.g., the Policies for the Preparation, Supervision, Distribution and Retention of Written and Electronic Communications and the Mortgage Compliance 2007 Trading Desks Manual) concerning suitability of investment recommendations made to clients.

86.     Having informed Defendant Viniar that it would expand its targeted clients to include Basis Capital and others, the Mortgage Department finalized sales of Timberwolf securities to Basis Capital on June 18, 2007. This client made a long investment of $50 million in Timberwolf AAA-rated securities at an implied cash price of 84 cents on the dollar and a long investment of $50 million in Timberwolf AA-rated securities at an implied cash price of 77 cents on the dollar. When informed that the Company's internal valuation for the AA-rated securities was 65 cents on the dollar, Montag responded "great." Coincident with these sales to Basis Capital, Mr. Sparks and Montag were informed that the Mortgage Department bought protection (*i.e.*, shorted) against the $100 million sold to Basis.

87.     When Mr. Sparks reported to Mr. Montag four days later, on June 22, that the Department had "300mm timberwolfs" to sell, Mr. Montag responded "boy that timeberwof [sic] was one shitty deal".

88.     By July 12, 2007, the Mortgage Department marked down Timberwolf AAA and AA rated securities to 65 cents on the dollar and 60 cents on the dollar, respectively. Four days later, the Mortgage Department marked them down to 55 cents on the dollar and 45 cents on the dollar, respectively.

89.     In addition to its Basis Capital client, the Mortgage Department targeted other

non-traditional CDO investor clients, including those in Korea (e.g., Hunkuk Life) and in Japan

(Star Bank), and elsewhere (Bank Hapoalim) at prices exceeding internal valuations.

90.     On July 13, 2007, the Mortgage Department prepared "Talking Points for Gary

Cohn." These talking points were prepared so that Defendant Cohn could respond to Defendant

Blankfein's request that he present an update during the Company's monthly partner meeting

scheduled for July 17, 2007. These points stated, part:

Market Commentary
-   Subprime mortgage market continues to be dislocated and illiquid
-   spreads tightened from March-May for technical reasons (supply & short
    covering)
-   Increases in delinquencies, slower prepayment speeds and interest rates rising
    continued to weigh on the market in the face of weaker housing prices
-   BSAM [Bear Stearns Asset Management] & other hedge fund managers (most
    recently Basis Capital) announced they were halting fund redemptions and/or
    liquidating holdings, with some likely to fail
-   Rating agencies announced a series of downgrades and/or securities placed on
    negative watch.   Agencies also adopted significant changes in rating and
    surveillance methodologies using more punitive stress assumptions which will
    result in more aggressive downgrade actions on existing deals and require greater
    credit enhancement on new deals.
-   ABX prices dropped dramatically in reaction with new issue residential and CDO
    prices following suit....
                                    □ * *
Subprime loan & securitization commentary:
-   Industry wide, subprime loan origination is down 40% in 2007 and headed lower
-   7 of the top 10 subprime lenders in '06 are either out of business or have changed
    ownership
                                    * * *
-   CDO securitization market is coming to a standstill, GS has zero in warehouse
    Defendant Cohn's talking points also included specific metrics depicting progress
    on the structured exits.   For example, the Mortgage Department's CDO
    warehouse holdings were reduced as follows: $5.7 billion (11/25/06), $1.7 billion
    (5/15/07), $0 (current).   Its retained CDO bonds were as follows:   $360 million
    (11/25/06), $4.5 billion (5/15/07), $2.5 billion (current).

91.     The Mortgage Department issued markdowns of its clients' CDO and other

investments at months end in June, July and August in response to internally expected ratings

downgrades of RMBS securities or to customer credit issues. One, taking effect on July 25, 2007, was referred to by Mr. Sparks as "the CDO monster remark" and was due to Basis' credit issues (Basis financed its Timberwolf investments through the Company) and other counterparty exposures. The Company's clients'/counterparties' negative reaction to the "monster remark" was immediate, and total collateral disputes increased $3.7 billion from the prior week, to $7 billion. "Collateral disputes" meant customers disputing the lower valuations. This information was communicated in a July 31 email to Defendant Viniar, Montag, Mr. Sparks, and others. It was also forwarded to Defendant Blankfein, who instructed "Make sure they prioritize weaker credits where our risk is threatening." Among the largest clients/counterparties disputing the lower valuations was Morgan Stanley, the largest long Hudson investor.

92.     By August 14, 2007, Mr. Sparks reported to Defendant Cohn, Defendant Viniar, employee director Winkelried, Management Committee member Montag:

> Mortgage CDO market has continued to be hammered with combination of the large downward move in subprime RMBS, rating agencies action, and no liquidity. For example, our market for the Timberwolf A2 (mezz AAA) that we marked at the end of May at 80 is now 15/25. Mortgage CDOs are so geared that many tranches are priced to IO [interest only] value, and it's not just liquidity – there are fundamental cashflow issues.

93.     On September 17, 2007, the Board (including Defendant Blankfein, Defendant Cohn, employee director Winkelried, Defendant Dahlback, Defendant Friedman, Defendant George, and Defendant Johnson, among others) again met and received a presentation entitled "Residential Mortgage Business."

94.     Slide 3, entitled "How Missed Signs Contributed to a Mortgage Meltdown" indicates that the Board discussed, in part:

> a.  "Fremont General stops making subprime loans" (March 2007);

> b. "New Century Financial, the second largest subprime lender, stops making loans" (March 2007);
>
> c. "New Century Financial files for bankruptcy" (April 2007);
>
> d. "Standard & Poor's and Moody's downgrade bonds backed by subprime mortgages. Fitch follows suit" (July 2007);
>
> e. "Basis Capital, an Australian hedge fund firm, hires advisors to help stanch mortgage losses" (July 2007);
>
> f. "Countrywide Financial, the nation's largest mortgage lender, draws down $11.5 billion from its credit lines" (August 2007).

95.     Slide 4, entitled "Business Reaction Tactical Positioning" indicates that the Board discussed the following Mortgage Department activities:

> a. "Q1 2007" "[s]hut down all residential mortgage warehouses...[i]ncreased protection on disaster scenarious";
>
> b. "Q2 2007" "[s]hut down all CDO warehouses", "[t]ook significant mark to market losses";
>
> c. Q2 2007 and Q3 2007" "[s]horted synthetics", "[s]horted CDOs and RMBS", "[r]educed long inventory".

96.     Slide 5, entitled "Mortgage Business at GS Revenues" indicates that the Board discussed detail about Structured Products Trading revenues during 2006 ($401 million), Q1 2007 ($174 million), Q2 2007 ($50 million), Q3 2007 ($731 million), and YTD 2007 ($955 million).

97.     Slide 6, entitled "GS Subprime Mortgage Business Subprime Risk: Current Position as of 8/31/07" indicates that the Board discussed:

> a. Long investments:   $1 billion subprime loans, $.1 billion subprime residuals, $.7 billion Alt-A loans, $.1 billion Alt-A residuals, $1.9 billion cash RMBS, $2.5 billion cash CDO, $0 CDO warehouse assets, $3.6 billion ABX;
>
> b. Short investments:   $1.6 billion ABX, $5.1 billion RMBS CDS, $3.3 billion CDO CDS.

98. By October 30, 2007, the collateral disputes were still large, totaling approximately $6.5 billion, and included the largest Hudson investor.

**F.** **The Trilateral Commission Document.**

99. On November 13, 2007, a set of talking points was circulated among Craig Broderick (Chief Risk Officer), Sarah Smith (Chief Accounting Officer and Controller), Robert Berry (Global Head of Market Risk), Kenneth Josselyn (in-house counsel), and others in preparation for the next day's meeting with the SEC and other regulators (collectively, the Trilateral Commission).

100. These talking points set forth certain introductory comments, Trilateral Commission questions, and responses, including:

> **Introductory Comments – SARAH/CRAIG**
> * * *
> We first observed disturbing trends in the performance of sub prime debt in late December, early January and began marking down positions at that time....
> * * *
> We supplemented our risk reporting packages as necessary and discussed our mortgage book at every Risk Committee meeting throughout the year. We've made several presentations to the Board regarding mortgage exposures and we will make another tomorrow.
>
> **Senior Management Oversight**
> * * *
> At what point were senior executives or the Board of Directors made aware of specifics surrounding the impact that the market disruption may have on the firm's business? What led to the decision to communicate the relevant issues to Directors or senior executives?
> **RBerry**
> There is constant communication from the revenue side and the control side of the firm with the 30th floor. In addition David[Viniar]/Jerry[Corrigan] co-chair FWRC [Firmwide Risk Committee] and Lloyd[Blankfein]/Gary[Cohn] regularly attend
>
> **CBroderick**
> Sept'06 Risk presentation....
> March'07Subprime Mortgage Business presentation
> Sept '07 Residential Mortgage presentation

What special sessions, if any, were held with the Board of Directors/senior executives, or what reports were shared, to ensure that they understood the specifics related to valuation issues, conduits, structured investment vehicles, leveraged lending, etc.?

**BLee**

Quarterly PV presentations to the Board

Weekly Risk Committee Meetings, attended by DViniar and GCohn, and often LBlankfein

Recent meetings with Lloyd & Gary re: pricing

What role, if any, did the Board/senior executives play in re-assessing the firm's risk appetite and strategy?

**RBerry**

Limits are set by FWRC. Decisions regarding e.g. short positions in mortgages taken by business units but with full knowledge of the 30th floor.

**C Broderick**

FWCC [Firmwide Capital Committee] approves each significant financing transaction

## G.    The Aftermath Of The Hudson, Anderson, and Timberwolf Issuances.

101.    After Hudson, Anderson, and Timberwolf closed, the Mortgage Department's CDO Origination Desk was effectively shut down and its inventory moved to secondary trading. Shortly thereafter, on May 19, 2007, a senior mortgage trader told to the head of Structured Products Trading:

If you talk to people knowledgeable about cdos, you will find that external perceptions of GS franchise in this space is much lower than Sparks and Sobel believed. Over last 2 years, GS is perceived to be a bottom quartile abs cdo underwriter and to have done several poor deals.... The fact that pete [Ostrem, the head of the CDO Origination Desk]...could only get TCW, GSC (both street wh—e) managers to work with GS is a stain that will take time to remove.... These are not just my views – they are from customers whose views resonate in the market. Sales people have just been too timid internally or not engaged enough with their accounts to provide accurate feedback. It pains me to say but...among large dealers only ML [Merrill Lynch] is more reviled than ostrem's business.... [I]t will not be business as usual for a LONG time.

102.    In March 2007, when a client asked how to hedge against further declines in Hudson value, a Company trader wrote "their likelihood of getting principal back is almost zero.

103.   On August 2, 2007, Stacy Bash-Polley, a senior sales executive, informed Montag, Mr. Schwartz, Mr. Sparks, and others of several clients' concerns, including the following six:

> a.   "...They have not agreed with our process and recently asked other dealers to analyze—say that we are off significantly from where other dealers are modeling this";
>
> b.   "...We took their mark on the Fort Denison from 93.16 to 40.00  They admit the AAA CDO mkt is off substantially but feel that this particular bond.. Being a front cashflow (shorter) AAA with a (3yr) ave life would perform better than the junior AAA market as a whole.  Meanwhile, we took Hudson Mezz 06-1A AF AAA from 80.4 to 65.  They would like our thoughts as to why Fort Den was marked down so much more";
>
> c.   "...The Alt A marks were particularly punitive.... Our offerings are still 10-20 points higher than the marks.  Look at GSAA 2007-7";
>
> d.   "...They bought AAA cdos.... They have communicated to sales that GS is by far an outlier and they will never be able to buy another cdo from us based on their lack of confidence in understanding how we are coming up with marks";
>
> e.   "...issues with their CDO marks.  Said we were many points behind where other dealers were marking similar positions";
>
> f.   "...Greywolf...  Client traded them away at a much better price".

104.   On October 12, 2007, the Company's head of European fixed income sales wrote to Mr. Sparks:

> Dan.  Real bad feeling across European sales about some of the trades we did with clients.  The damage this has done to our franchise is very significant.

105.   Consistent with Defendant Blankfein's, Defendant Cohn's, and Defendant Viniar's continued monitoring and direction of the Company's Mortgage Department structured exits and other proprietary trading strategies, they exchanged several emails including for example:

a. Defendant Blankfein's inquiry to Defendant Viniar on October 30, 2007, "How did the review of the mortgage and cdo books go?" to which Defendant Viniar replied, "Extremely well. You will be very pleased";

b. Defendant Blankfein's email to Defendant Cohn, Defendant Viniar, and employee director Winkelfried on November 18, 2007 "Of course we did not dodge the mortgage mess. We lost money, then made more than we lost because of shorts";

c. Defendant Cohn's email to Defendant Blankfein, Defendant Viniar, and employee director Winkelried on November 18, 2007, observing, "We were just smaller on the toxic products";

106.    In the wake of financing the purchase of Timberwolf securities by Basis, at prices that were higher than the Company's internal valuations, the Company had another problem concerning its sales of Hudson to Morgan Stanley. After repeatedly contesting the Mortgage Department's lowered Hudson valuations, and repeatedly demanding that the Mortgage Department liquidate Hudson, Morgan Stanley sent a letter to in house counsel of the Company (Fran Bermanzohn) on February 28, 2008. The letter explained that approximately $1 billion worth of Hudson's underlying assets had become impaired, and that this required the Company to liquidate those assets. It went on to explain that the Company's failure to do so was a breach of contract, and that Morgan Stanley and Hudson had suffered significant damages as a result thereof.

107.    In response, Bermanzohn falsely asserted in a March 10, 2008 letter that the Company was only a broker in Hudson and that the Company had discretion concerning

44

liquidations. In fact, by bringing Hudson to market the Company transferred risk to loss from its own balance sheet.

108. With respect to Hudson, the Subcommittee reported its findings to the public on April 13, 2011:

> By shorting Hudson, Goldman had transferred $1.2 billion worth of risky ABX assets Goldman wanted off its books, and shorted another $800 million in RMBS securities....
>
> * * *
>
> Over the next year Goldman pocketed nearly $1.7 billion in gross revenues from Hudson..., all of which was at the expense of Hudson investors. As the value of the RMBS securities referenced in the ABX indices declined, Goldman, as the sole short party in Hudson, collected $1.393 billion in gains directly from the investors to whom it had sold the Hudson securities.... Goldman made another $304 million in gains due to its short of the other $800 million in single name CDS contracts included in Hudson.... That $304 million gain was also at the expense of the investors to whom Goldman had sold the Hudson securities.
>
> * * *
>
> In contrast to Goldman, Hudson...investors suffered substantial losses. In March 2007, less than three months after the issuance of the Hudson securities, when asked to analyze how a holder of Hudson securities could hedge against a drop in their value, a Goldman trader wrote: "their likelihood of getting principal back is almost zero." Six months later, the credit rating downgrades began. In September 2007, Moody's downgraded several Hudson...securities and followed with additional downgrades in November 2007. S&P began downgrades of Hudson...in December 2007, and by February 2008, had downgraded even the AAA rated securities.
>
> Morgan Stanley, the largest Hudson investor, lost $930 million. As other investors incurred increasing losses, they sold their securities back to Goldman at rock bottom prices. In September 2007, for example, nine months after the Hudson securities were first issued, Goldman repurchased $10 million worth of Hudson securities from Greywolf Capital at a price of five cents on the dollar; in October 2007, another hedge fund sold $1 million in Hudson securities back to Goldman at a price of 2.5 cents on the dollar. In November 2008, Hudson...was completely liquidated by Goldman. Today, Hudson securities are worthless.

109. With respect to Anderson, the Subcommittee reported:

.... Goldman's biggest gain came from holding 40% of the short position on certain Anderson assets, which produced a $131 million gain at the direct expense of the investors to whom Goldman had sold the Anderson securities....

* * *

Anderson's nine investors suffered more substantial losses. Seven months after its issuance, in November 2007, Anderson securities experienced their first ratings downgrades. At that point, 27% of the assets underlying Anderson were downgraded below a B- rating. GSC then sold back to Goldman a portion of the Anderson securities it had purchased at a price of 3 cents on the dollar. Within a year, Anderson securities that were originally rated AAA had been downgraded to BB. In the end, the Anderson investors were wiped out and lost virtually their entire investments.

110. With respect to Timberwolf, the Subcommittee found that:

In September 2007, Mr. Montag asked for data tracking the drop in prices for a Goldman CDO that experienced a dramatic fall in value, such as Timberwolf. In response, a Goldman employee provided prices for the A2 tranche of the Timberwolf securities using a combination of Goldman's internal marks and the bids provided to investors, from the issuance of the CDO on March 27, 2007 through September. The data showed that, in six months, prices for Timberwolf's AAA rated A2 security had fallen from $94 per security to $15, a drop of almost 80%....

* * *

Goldman profited in part from Timberwolf's decline in value due to its 36% short interest in the CDO....

Timberwolf experienced its first credit rating downgrades in November 2007, just eight months after the CDO closed and issued its securities. The downgrades included the AAA rated securities. In March 2008, one year after Timberwolf was issued, its AAA securities were downgraded to junk status. In June 2008, a controlling class of debt investors voted to liquidate Timberwolf, and the deal was terminated in October 2008.

Goldman's 36% short position in Timberwolf produced about $330 million in revenues at the direct expense of the clients to whom Goldman had sold the Timberwolf securities....

Timberwolf's investors lost virtually their entire investments. Basis Capital ended up declaring bankruptcy and has filed suit against Goldman.

**G.    The Individual Defendants Knowingly Concealed Actual Conflicts.**

111.    Throughout the Relevant Period, the Board (consisting of Defendant Blankfein, Defendant Cohn, Defendant Dahlback, Defendant Friedman, Defendant George, Defendant Johnson, and others) and Defendant Viniar publicly disclaimed risks of conflicts between the interests of the Company and those of its clients, and they maintained that the Company operated under policies and procedures to identify and avoid conflicts of interest and to put all of its clients first.

112.    On January 29, 2008, Defendants caused the Company to file its 2007 Form 10-K with the SEC, stating:

**Trading and Principal Investments**

[....]  To meet the needs of our clients, Trading and Principal Investments is diversified across a wide range of products.  We believe our willingness and ability to take risk to facilitate client transactions distinguishes us from many of our competitors and substantially enhances our client relationships.

Our Trading and Principal Investments segment is divided into three components: Fixed Income, Currency and Commodities; Equities; and Principal Investments.

***Fixed Income, Currency and Commodities and Equities***

Fixed Income, Currency and Commodities (FICC) and Equities are large and diversified operations through which we engage in a variety of customer-driven and proprietary trading and investing activities.

In our customer-driven businesses, FICC and Equities strive to deliver high-quality service by offering broad market-making and market knowledge to our clients on a global basis.  In addition, we use our expertise to take positions in markets, by committing capital and taking risk, to facilitate client transactions and to provide liquidity.  Our willingness to make markets, commit capital and take risk in a broad range of fixed income, currency, commodity and equity products and their derivatives is crucial to our client relationships and to support our underwriting business by providing secondary market liquidity.

\* \* \*

Our FICC and Equities businesses operate in close coordination to provide clients with services and cross-market knowledge and expertise.

Substantially the same statements were included in the Company's 2008 and 2009 Forms 10-K that Defendants caused the Company to file on January 27, 2009 and March 1, 2010, respectively.

113.    The 2007 Form 10-K also stated:

***Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses.***

Our reputation is one of our most important assets.  As we have expanded the scope of our businesses and our client base, **we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict**, or are perceived to conflict, **with the interests of another client**, as well as situations where one or more of our businesses have access to material non-public information that may not be shared with other businesses within the firm.

\* \* \*

**We have extensive procedures and controls that are designed to identify and address conflicts of interest, including those designed to prevent the improper sharing of information among our businesses.**  However, **appropriately identifying and dealing with conflicts of interest is complex and difficult, and our reputation could be damaged** and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to identify and deal appropriately with conflicts of interest.

Substantially the same statements were included in the Company's 2008, 2009, 2010 and 2011 Forms 10-K that Defendants caused to Company to file with the SEC on January 27, 2009, March 1, 2010, March 1, 2011, and February 28, 2012, respectively.

114.    In addition, the Company's 2007 – 2010 Annual Reports, which Defendants caused the Company to publish and disseminate, set forth the following "Goldman Sachs Business Principles":

<u>1.</u>  **Our clients' interests always come first**.  Our experience shows that if we serve our clients well, our own success will follow.

<u>2.</u>  Our assets are our people, capital and reputation.  If any of these is ever diminished, the last is the most difficult to restore.  **We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us**.  Our continued success depends upon unswerving adherence to this standard.

\* \* \*

<u>14.</u>  **Integrity and honesty are at the heart of our business**.  We expect our people to maintain high ethical standards in everything they do, both in their work for the firm and in their personal lives.

115.  On June 14, 2007, Defendant Viniar made the following statement to securities analysts during the 2007 second quarter earnings conference call:  "Most importantly, and basic reason for our success, is our extraordinary focus on our clients."

116.  Moreover, Defendant Blankfein made the following statement during his presentation to the Merrill Lynch Banking and Financial Services Investor Conference held on November 13, 2007:  "What drove performance was the quality of our client franchise.  To me, franchise describes the extent to which our clients come to us for help, advice, and execution.  From those relationships, business opportunities are brought to the firm."

117.  Defendant Blankfein also made the following statements during his presentation to the Bank of America – Merrill Lynch Financial Services Conference, held on November 10, 2009:

Slide 1

\* \* \*

Our self-help actions were consistent with our historical behavior of maintaining one of the most conservative risk profiles in our industry.  And **through strong risk management guided by a disciplined fair value accounting process, we remain every bit as focused on protecting our shareholders' equity, our client franchise and our reputation**.

49

Over the past year, clients have come to Goldman Sachs because we integrate strategic advice, risk management, financing, trading and investing skills. **Our job – our duty to shareholders – is to protect and grow this client franchise that is the lifeblood of Goldman Sachs.** And the best way we know how to do that is to safeguard our culture of performance and risk management, which has allowed us to be nimble and reactive, yet defined by prudent, long-term thinking....

\* \* \*

Slide 3

**Our client franchise is the core of our business model and strategy**, and its quality and depth is shaped by the skill, talent and collaboration of our people. **Our strategy is to integrate advice, financing and co-investing with best-in-class risk management to a broad range of largely institutional clients**....

\* \* \*

Slide 19

\* \* \*

During our history, **our firm has been guided by three tenets: the needs and objectives of our clients; attracting talented and long-term oriented people; and our reputation and client franchise. We remain every bit as focused on these ambitions.** We have a clear strategy to integrate advice and capital with risk management. We have built a diverse set of businesses. We have an expanding global footprint. And, we have established a proven culture of risk management.

We, no doubt, will encounter our fair share of challenges and mis-steps – and we already have. But **the legacy of client service and performance for our shareholders, which every person at Goldman Sachs is charged with protecting and advancing, must be continually nurtured and passed on to future generations.** And, **I have never been more confident of that outcome.**

118.   The above statements were knowingly false. As alleged herein, the Individual Defendants caused the Company's Mortgage Department to embark on a risk reduction program that, as executed, created actual conflicts of interest between the Company and its clients. When the above statements were made, the Individual Defendants knew that these conflicts already

50

existed. Only when the Subcommittee fully released the Company's internal documents and published its report in April 2011 was the truth revealed.

## V. DAMAGES TO THE COMPANY

119. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

120. The Individual Defendants' conduct caused the Company significant damages, including: (i) reputational damage; (ii) costs associated with the Subcommittee's investigation; (iii) decline in the Company's share price; (iv) costs associated with ongoing class action litigation brought by the Company's shareholders against the Company, Defendant Blankfein, Defendant Cohn, and Defendant Viniar alleging securities fraud in connection with actionable misstatements at issue here; and (v) costs associated with ongoing individual direct litigation brought by the Company's clients (including Basis Capital) who purchased Hudson, Anderson, or Timberwolf securities.

121. In addition, future damage to the Company may occur as a result of the aforementioned litigation against it.

## VI. DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

122. Plaintiff incorporates by reference and realleges each and every allegation as though fully set forth herein.

123. Plaintiff brings this action derivatively on behalf of and for the benefit of Goldman to redress injuries suffered and yet to be suffered by it as a direct and proximate result of the breaches of fiduciary duty alleged herein. Goldman is named as a nominal defendant solely in a derivative capacity.

124. Plaintiff purchased shares of Goldman common stock during the Relevant Period, and has held such shares continuously since he purchased them. Thus, Plaintiff was a Goldman shareholder at the time of the wrongdoing complained of herein. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in this litigation, and intends to retain shares of the Company throughout the duration of this litigation.

125. The wrongful acts complained of herein, subject, and will continue to subject, Goldman to harm because the adverse consequences of the injurious actions are still in effect and ongoing.

126. The wrongful actions complained of herein were unlawfully concealed from the Company's shareholders until the Subcommittee completed its investigation and published its findings and the Company's internal documents in April 2011.

127. Goldman's current Board is comprised of the following thirteen directors: Defendant Lloyd C. Blankfein, Defendant Gary D. Cohn, Defendant Gary Viniar, Defendant Claes Dahlback Defendant Stephen Friedman, Defendant William W. George, Defendant James A. Johnson, M. Michele Burns, Lakshmi M. Mittal, Adebao O. Ogunlesi, James J. Schiro, Debra L. Spar, and Mark Edward Tucker. Seven of them – Defendant Blakfein, Defendant Cohn, Defendant Dahlback, Defendant Friedman, Defendant George, and Defendant Johnson – were directors at the time Hudson, Anderson, and Timberwolf were sold to the Company's clients and during the time that the actual conflicts were concealed from the Company's clients.

128. Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants pertaining to their wrongful concealment of these actual conflicts. Such a demand would be a futile and useless act because there is a reasonable doubt that: (1) the actions by at least half of the current Board which damaged the Company were the product of a valid

exercise of business judgment; and/or (2) at least half of the current Board is capable of making an independent and disinterested decision to institute and vigorously prosecute this action. Therefore, demand is legally excused.

129. The Company's Code of Conduct and Business Ethics, embodying the Company's "commitment to conduct our business in accordance with the highest ethical standards and in compliance with all applicable laws, rules and regulations," applied to all of the Company's employees and directors. It was internally followed and required employees and directors to refrain from "knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the firm to others ... within ... the firm[.]"

130. Defendant Blankfein, Defendant Cohn, Defendant Viniar, employee director Winkelried, Management Committee member Montag, and Mr. Sparks, among others, provided all material facts concerning the Mortgage Department's structured exit activities when reporting to each other and to Defendant Dahlback, Defendant Friedman, Defendant George, and Defendant Johnson during 2006 through 2007. In addition, senior management (*e.g.*, Defendant Blankfein, Defendant Cohn, employee director Winkelried, and Defendant Viniar) decided "how to reduce positions" in mortgage-related investments, and the Mortgage Department's activities were discussed at every FWRC meeting throughout 2007. Thus, there is every reason to believe that they provided all material facts when reporting to each other and to Defendant Dahlback, Defendant Friedman, Defendant George, and Defendant Johnson.

131. Thus, at least half of the current Board (Defendants Blankfein, Cohn, Viniar, Dahlback, Friedman, George, and Johnson) was directly or indirectly advised by Mortgage Department personnel, Management Committee member Montag, Defendant Blankfein, Defendant Cohn, Defendant Viniar, employee director Winkelried, and/or other senior

executives serving on the Management Committee or on committees reporting to the Management Committee of how the Mortgage Department was executing structured exits from long ABX, CDO warehouse, and other assets. More specifically, they were told about how the Company was transferring risks of losses to clients who purchased long investments in Hudson, Anderson, and/or Timberwolf securities.     This conclusion reasonably follows from the particularized allegations set forth above including, for example only:

> a. Mr. Sobel's report to Defendant Viniar and others at the August 9, 2006 Firmwide Risk Committee meeting that the ABX "had run its course" and that the Mortgage Department would "reduce exposures";
>
> b. Mr. Sobel's report to Defendant Viniar and others at the September 9, 2006 Firmwide Risk Committee meeting that the Mortgage Department was working "to reduce volatile ABX position" while "[s]ecuritization calendar picking up";
>
> c. Mr. Sobel's report to Defendant Viniar and others at the September 20, 2006 Firmwide Risk Committee meeting that the CDO Origination Desk was working on the "first ever" ABX CDO that would function as an exit for the Company's long ABX investments, information that was significant because it only meant that the deal would be structured such that the Company would be making a large short investment against the securities it planned to sell clients;
>
> d. The fact that as the "first ever" ABX CDO, it was subject to the review and approval of the Firmwide Capital Committee (and/or a subcommittee thereof) co-headed by Defendant Viniar;

e. Mr. Sobel's and a risk officer's October 2006 reports to Defendant Viniar, Defendant Cohn, Defendant Blankfein, and employee director Winkelried on the progress of selling the "first" ever" ABX CDO securities to clients and the fact that "[r]isk reduction is primarily due to pricing of $2bn Hudson Mez synthetic CDO deal…";

f. Defendant Viniar's December 2006 directive to the Mortgage Department to "be aggressive distributing things because there will be very good opportunities as the markets goes into what is likely to be even greater distress…";

g. Numerous direct and indirect reports during late 2006 through 2007 by Mr. Sparks to Defendant Viniar, members of the Firmwide Risk Committee, Defendant Blankfein, Defendant Cohn, employee director Winkelried, Management Committee member Montag, Managing Director Ruzika, about continued and increasing stress in the subprime mortgage markets including specific communications about the Mortgage Department's work on structured exits, early payment defaults by subprime originators (e.g., New Century and Fremont), fraud at origination of subprime mortgage loans held by the Company, "[s]ubprime environment – bad and getting worse", losses being incurred on long mortgage-related investments including those related to CDO warehoused assets awaiting securitization, continued "buying protection" (*i.e.*, shorting), "the CDO warehouse is the position that is the one of potential concern" [and] "the key is to find super-senior protection providers for the

remaining deals" (*i.e.*, Anderson, Timberwolf, and others), "[w]e have CDO CDS shorts for protection, but deal execution is key", "Game Over.... The Mortgage business is currently closing down every subprime exposure possible", and

h. The detailed presentations Mr. Sparks made to Defendant Viniar and to the Board during late 2006 through 2007.

132.    Following the structured exits that created actual conflicts, at least half of the current Board (Defendants Blankfein, Cohn, Viniar, Dahlback, Friedman, George, and Johnson) caused the Company to file its Forms 10-Ks and Annual Reports during the Relevant Period. Those documents disclaimed the possibility that conflicts between the Company's and its clients' interests might occur and, additionally, asserted that the Company adhered to Goldman Sachs Business Principles such as "Our clients' interests always come first," "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us," and "Integrity and honesty are at the heart of our business." These statements were false and misleading and were actionable violations of the Federal securities laws (*e.g.*, Section 10(b) of the Securities Exchange Act of 1934). *See Richman v. Goldman Sachs Group, et al.*, No. 10-Civ-2461 (PAC), 2012 U.S. Dist. LEXIS 86556 (S.D.N.Y. June 21, 2012). Directors of a company who cause it to violate applicable positive law do not exercise valid business judgment.

133.    Further, Plaintiff did not make a demand on the current Board before instituting this action because the facts alleged herein create a reasonable doubt that a majority of the Board could have properly exercised independent and disinterested business judgment in responding to such a demand.

134.    There is reason to doubt that at least two members of the current Board (Defendant Blankfein and Defendant Cohn) are independent and disinterested because they are employee directors, they knew that the structured exits created actual conflicts between the Company and its clients, and they are subject to potential liability under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 for substantially the same actionable misstatements and omissions in the Company's Forms 10-K and Annual Reports as set forth above. *Richman*, 2012 U.S. Dist. LEXIS 86556 at **48-49.

135.    In addition, there is reason to doubt that at least five current outside director Board members (Defendant Viniar, Defendant Dahlback, Defendant Friedman, Defendant George, and Defendant Johnson) are disinterested because as particularly alleged herein, they were directly or indirectly knowledgeable about the structured exits, and that such exits created actual conflicts between the interests of the Company and its clients. Moreover, under the Company's Corporate Governance, Defendant Dahlback, Defendant Friedman, Defendant George and Defendant Johnson, as members of the Company's Audit Committee, were specifically charged with assisting (and they did assist) the Board in overseeing the Company's compliance with legal and regulatory requirements and the Company's management of market, credit, liquidity and other financial and operational risks. They discussed and met with management in furtherance of those responsibilities, and discussed with General Counsel and/or Chief Compliance Officer any significant legal, compliance or regulatory matters that had a material impact on the Company's business, financial statements or compliance policies. Accordingly, these four directors knew that the structured exits created actual conflicts between the Company and its clients, and knowingly and affirmatively decided against ensuring that statements in the Company's Forms 10-K and Annual Reports were materially accurate. These

57

directors face a substantial likelihood of liability for breaches of their fiduciary duties of loyalty owed to the Company.

136. In addition to the above, Defendant Blankfein faces a substantial likelihood of personal liability for having falsely or misleadingly attributed the Company's fiscal 2007 performance to the following:

    a. "What drove performance was the quality of our client franchise[,] [...] the extent to which our clients come to us for help, advice, and execution";

    b. "through strong risk management guided by disciplined fair value accounting process, we remain every bit as focused on protecting our shareholders' equity, our client franchise and our reputation";

    c. "[o]ur client franchise is the core of our business model and strategy, and its quality and depth is shaped by the skill, talent and collaboration of our people";

    d. "[d]uring our history, our firm has been guided by three tenets: the needs and objectives of our clients; attracting talented and long-term oriented people; and our reputation and client franchise[,] [and] [w]e remain every bit as focused on these ambitions."

## COUNT I

### DERIVATIVELY ON BEHALF OF GOLDMAN AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

137. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

58

138.    At all relevant times the Individual Defendants owed the utmost fiduciary duty of loyalty to the Company and its shareholders.

139.    The Individual Defendants' duty of loyalty required that they act honestly and in good faith to protect the best interests of the Company and its shareholders.

140.    At all relevant times, the Individual Defendants knew about the significant volatility and deterioration in the subprime mortgage market and the Mortgage Department's structured exit strategy.

141.    At all relevant times, the Individual Defendants knew that Company policy required them and all Company employees to treat the Company's clients' interests as paramount.

142.    At all relevant times, the Individual Defendants knew that the Hudson, Anderson, and Timberwolf structured exit strategies presented significant reputational risks to the Company.

143.    At all relevant times, the Individual Defendants knew that the CDOs discussed herein were intended to move risks of losses from the Company's books to its clients, but that the Company's reputation depended on adherence to the Code of Business Conduct and Ethics and to applicable positive law.

144.    At all relevant times, the Individual Defendants knew that the CDO structured exits created actual conflicts between the Company and its clients' interests.

145.    At all relevant times, the Individual Defendants knew that their statements and those they caused to be made in the Company's SEC filings and Annual Reports were materially false and misleading.

146.    Accordingly, the Individual Defendants breached their duties of loyalty by acting unfaithfully to the Company and its shareholders by causing the Company to make false statements in its Forms 10-K and Annual Reports.

147.    The Individual Defendants are not entitled to any protections that may otherwise be afforded by the business judgment rule, particularly because causing the Company to violate applicable positive law is never a valid exercise of business judgment and because the loyalty claims here are not exculpable.

148.    As a proximate result of the Individual Defendants' breaches of their fiduciary duties, the Company suffered and continues to suffer substantial damages, in an amount to be determined at trial.

## COUNT II

### DERIVATIVELY ON BEHALF OF GOLDMAN AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMNIFICATION

149.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150.    As a result of the wrongful conduct alleged above, in addition to the claims asserted herein, the Company also faces potential liability in connection with direct claims against it asserted by various persons, entities and/or classes that also give rise to the Defendants' liability to the Company.

151.    The Company's alleged liability on account of the wrongful acts and practices to the misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants in connection with all such claims that have been, are, or may be in the future asserted against Goldman by virtue of the defendants'

misconduct and breaches of fiduciary duty. Plaintiff, on behalf of Goldman, has no adequate remedy at law and is entitled to indemnity or contribution from Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, on behalf of Goldman, Plaintiff prays for judgment as follows:

A.      A determination that this action is a proper derivative action maintainable under law and that demand is excused.

B.      A finding that the Individual Defendants breached their fiduciary duties of loyalty owed to the Company;

C.      Against each Individual Defendant, jointly and severally, and in favor of Goldman for the amount of damages sustained by Goldman as a result of the breaches of fiduciary duties by each Individual Defendant as alleged herein in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.      Requiring the Board to take all necessary actions to reform and improve the Company's corporate governance and internal compliance procedures and other procedures necessary to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to: putting forward for shareholder vote an amendment to the Company's Bylaws or Articles of Incorporation requiring the Board to adopt an independent chairman who has not been an executive officer of Goldman and has not held other affiliations or connections with Goldman.

E.      Requiring the Individual Defendants to return to Goldman all compensation and remuneration of whatever kind paid to them by Goldman during the time that they were in breach of the fiduciary duties they owed to Goldman;

61

F.      Directing the Individual Defendants to establish, maintain, and fully fund effective compliance programs to ensure that Goldman's directors, officers and employees do not engage in wrongful and illegal practices relating to trading strategies that conflict with the best interests of the Company's clients;

G.      For extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder;

H.      Awarding to Goldman restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

I.      Awarding punitive damages against the Individual Defendants, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum rate allowable by law;

J.      Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

K.      Granting any such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all applicable issues.

Dated: February 1, 2013          Respectfully submitted,

POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP

Jason S. Cowart
600 Third Avenue,
New York, NY 10017
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

*Local Counsel for Plaintiff Michael G. Brautigam*

**EMERSON POYNTER LLP**
John G. Emerson
jemerson@emersonpoynter.com
830 Apollo Lane
Houston, TX 77058-2610
Telephone: (281) 488-8854
Facsimile: (281) 488-8867

Scott E. Poynter
scott@emersonpoynter.com
William T. Crowder
wcrowder@emersonpoynter.com
500 President Clinton Ave., Ste. 305
Little Rock, AR 72201
Telephone: (501) 907-2555
Facsimile: (501) 907-2556

**JIGARJIAN LAW OFFICE**
Robert A. Jigarjian
jigarjianlaw@gmail.com
101 Lucas Valley Rd., Ste. 120
San Rafael, CA 94903

*Attorneys for Plaintiff Michael G. Brautigam*

### VERIFICATION AND AFFIDAVIT OF
### MICHAEL G. BRAUTIGAM

STATE OF _OHio_    )
                   )
COUNTY OF _HAMILTON_)

Michael G. Brautigam, being duly sworn deposes and says that:

1.    I am a Plaintiff in the above-entitled action, have read the foregoing Complaint, and believe it to be true and correct, and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

2.    I have not received, been promised or offered and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action except (i) such damages or other relief as the Court may award me, (ii) such fees, costs or other payments as the Court expressly approved to be paid to me; or (iii) reimbursement, paid by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

3.    I have been a Goldman Sachs Group, Inc. shareholder during all of the relevant periods alleged in the Complaint, and I continue to hold such shares.

4.    I hereby authorize filing of the Complaint.

Michael G. Brautigam

Sworn to before me this
30th day of January, 2013.

Notary Public

My commission expires: APRIL · 18 · 2016

MRUDULA PATEL
Notary Public, State of Ohio
My Commission Expires
April 18, 2016