UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MICHAEL G. BRAUTIGAM, an individual

       Plaintiff,

  - against -

LLOYD C. BLANKFEIN, GARY D. COHN,
DAVID VINIAR, CLAES DAHLBACK,
STEPHEN FRIEDMAN, WILLIAM W.
GEORGE, JAMES A. JOHNSON,

       Defendants,

  and

THE GOLDMAN SACHS GROUP, INC.

       Nominal Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 26, 2014

13 Civ. 0760 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

  Plaintiff Michael Brautigam ("Brautigam") brings this shareholder derivative action on behalf of The Goldman Sachs Group Inc. ("Goldman") to redress injuries as a result of alleged breaches of fiduciary duty by the seven individual defendants, Lloyd Blankfein, Gary D. Cohn, David Viniar, Claes Dahlback, Stephen Friedman, William W. George, and James A. Johnson (collectively, the "Individual Defendants"), all members of Goldman's Board of Directors. Goldman is named as a nominal defendant, solely in its derivative capacity.

  The Complaint is a condensed and restated version of the April 13, 2011 report by the US Permanent Subcommittee on Investigations entitled "Wall Street and the Financial Crisis: Analysis of a Financial Collapse." (Compl. ¶ 1.) The Complaint alleges that as the market for subprime residential mortgage backed securities ("RMBS") and other mortgage related assets began to decline, exposing Goldman to substantial losses, individuals at Goldman conceived a

1

plan to sell off the mortgage related assets in order to transfer its exposure to unsuspecting clients. This was accomplished by the sale of three collateralized debt obligation ("CDO") offerings[1]: Hudson, Anderson, and Timberwolf. Goldman sold the CDOs to its clients while Goldman held the short (here, the profitable) positions. (*See* Compl. ¶¶ 32, 35-39, 59, 64, 65, 67.)

Plaintiff has not made any demand on Goldman's Board of Directors to institute any action against the seven Individual Defendants pertaining to their alleged conflict of interest and breach of fiduciary duties. He claims that such demand would be futile.

Defendants move to dismiss, arguing: (1) the failure to make demand on the board of directors is not excused and any futility argument is barred by res judicata and collateral estoppel based on *In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig.*, 2012 WL 3293506 (S.D.N.Y. Aug. 14, 2012), and *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104 (Del. Ch. Oct. 12, 2011); (2) Plaintiff does not adequately allege particularized facts to support the conclusion that Plaintiff's failure to make demand on the board was excused; and (3) Plaintiff fails to state a claim upon which relief can be granted, because the misstatements allegedly made by Defendants are not actionable as a matter of law.

The Court finds that Plaintiff's failure to make prior demand on the Board of Directors is not excused, and therefore grants Defendants' motion to dismiss.

---

[1] A collateralized debt obligation is "a financial instrument that sells interests . . . to investors and pays the investors based on the performance of the underlying asset[s] held by the CDO." *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 46 (2d Cir. 2012).

2

## BACKGROUND[2]

Blankfein, Cohn and Viniar (the "Executive Defendants") served as senior executives at Goldman during the relevant period of time.  Each of the Executive Defendants was a member of Goldman's management committee.

Dahlback, Friedman, George and Johnson (the "Outside Directors") served as directors of Goldman and as members of its Audit and Risk committees during the relevant period of time, but were not Goldman employees.  During the time period at issue (2006-2011), members of Goldman's Audit and Risk committees met with senior Goldman personnel to discuss the issues within their areas of expertise.  (Compl. ¶¶ 22-25.)  Specifically, the Audit Committee was responsible for assisting the company's Board of Directors in overseeing Goldman's risk management and legal and regulatory compliance.  (*Id.* at ¶135.)  The Risk Committee reviewed and discussed, among other topics, Goldman's exposure to mortgage-related investments.  (*Id.* at ¶ 100.)

In the summer of 2006, Goldman's management recognized that the value of subprime residential mortgage backed securities ("RMBS") was beginning to decline, exposing Goldman to significant risks from its holdings of related securities. On August 9, 2006, Viniar and other senior executives were informed that the ABX index, which tracked the performance of RMBS, had "run its course" and that Goldman would begin to "reduce exposures."  (Compl. ¶ 32.)  On September 20, 2006, Viniar was told that because Goldman had been unable to sell its ABX investments, its mortgage department was working on structuring Hudson Mezzanine 2006-1 ("Hudson"), the "first ever" ABX collateralized debt obligation, in order to transfer exposure away from Goldman to the security's eventual investors. (*Id.* at ¶¶ 35-37.)  Hudson was a $2

---

[2] All facts are taken from the Complaint, unless otherwise noted, and are assumed to be true for purposes of this motion. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).

billion collateralized debt obligation comprising $1.2 billion in ABX assets from Goldman's inventory and $800 million in mortgage-related credit default swaps.[3] (*Id.* at ¶ 37.) In Hudson's marketing materials, Goldman informed potential investors that its interests would be "aligned" with theirs because it was purchasing equity in Hudson. (*Id.* at ¶ 38.) In reality, Goldman would own only $6 million of equity in Hudson, while simultaneously taking a much larger $2 billion "short" position on Hudson, meaning that it would profit if Hudson's underlying assets decreased in value. (*Id.*) Goldman also did not inform investors that Hudson's underlying assets were selected from Goldman's own inventory or that they had been priced internally by Goldman without reference to actual third-party sales of the underlying assets. (*Id.* at ¶¶ 38-39.) On October 25, 2006, Cohn and Viniar were told that more than 85% of Hudson's equity had been sold. (*Id.* at ¶ 41.) The next day, Blankfein and Cohn were informed that the reduction of Goldman's exposure to RMBS-related risk was "primarily due to" Hudson's success. (*Id.*)

In December, 2006, Viniar met with executives from Goldman's Mortgage Department and instructed them to work towards achieving a neutral risk position, neither long nor short in the mortgage market. (*Id.* at ¶ 47.) As he explained, his "basic message was [']lets be aggressive distributing things because there will be very good opportunities as the markets go into what is likely to be even greater distress and [Goldman] want[s] to be in position to take advantage of them.[']" (*Id.*) On February 8, 2007, Cohn and Viniar received an update from a subordinate that Goldman's "[t]rading position ha[d] basically squared" and that the Mortgage Department "plan[ned] to play from [the] short side": it would make investments designed to

---

[3] "A credit default swap . . . is a financial derivative that allows counterparties to buy and sell financial protection for the creditworthiness of specific corporations or sovereign entities . . . . A counterparty taking the position that the Reference Entities would *not* experience a "Credit Event" . . . is said to be the 'protection seller,' similar to an insurance underwriter. A counterparty taking the position that the Reference Entities *would* experience a Credit Event is the 'protection buyer,' similar to an individual purchasing insurance. A credit default swap differs from traditional insurance in that the protection buyer need not actually own the underlying asset or security in order to purchase protection on it." *Aladdin Capital Mgmt.*, 692 F.3d at 47 (emphasis in original).

profit from continuing declines in the value of RMBS because the "[s]ubprime environment [was] bad and getting worse." (*Id.* at ¶ 52.)

The Mortgage Department subsequently structured and issued Anderson Mezzanine 2007-1 ("Anderson") and Timberwolf I ("Timberwolf"), collateralized debt obligations referencing subprime RMBS,[4] in March, 2007. (*Id.* at ¶¶ 59, 64, 69, 77.) Shortly before Anderson and Timberwolf were issued, Goldman's mortgage department reported to Viniar and Blankfein that the "meltdown for subprime lenders" was "accelerating" and that the mortgage department was in the midst of "closing down every subprime exposure possible." (*Id.* at ¶ 66.) Nearly half of the subprime RMBS referenced in Anderson contained mortgages originated by companies that were known to senior Goldman executives, including Cohn and Viniar, for issuing low-quality mortgages. (*Id.* at ¶ 60.) Goldman Executive Daniel Sparks considered cancelling Anderson's offering due to substandard quality of the securities it referenced, but ultimately brought it to market. (*Id.* at ¶ 61.) Goldman did not disclose these concerns to investors, nor did it disclose that it would be taking a significant short position on Anderson. (*Id.* at ¶ 62.) Goldman similarly took a short position on Timberwolf, whose underlying assets had already experienced significant declines in value prior to Timberwolf's offering. (*Id.* at ¶¶ 64-65.)

By May 2007, credit markets had seized up, preventing accurate valuations of Hudson, Anderson, and Timberwolf. (*Id.* at ¶ 79.) Goldman's Mortgage Department was forced to rely on various valuation methods rather than market prices. (*Id.*) This resulted in internally reduced valuations for Hudson, Anderson, and Timberwolf by hundreds of millions of dollars, due to underperformance and "the poor demand for [collateralized debt obligations] in general." (*Id.* at

---

[4] Unlike Hudson and Anderson, Timberwolf was a "CDO squared," meaning that it was a collateralized debt obligation directly referencing other collateralized debt obligations that referenced subprime RMBS. (*Id.* at ¶ 64.)

¶¶ 80-83.) Nevertheless, the Mortgage Department continued to sell Timberwolf securities at prices far exceeding its own internal valuations, in part by targeting its sales to customers who had not traditionally invested in such securities. (*Id.* at ¶¶ 84-86, 89.) While the Mortgage Department continued to sell Timberwolf securities to clients at inflated prices, internally Timberwolf was referred to as "one shitty deal." (*Id.* at ¶ 87.) On July 25, 2007, the Mortgage Department eventually informed clients that it had marked down the value of the securities at issue, in what was referred to internally as "the CDO monster remark," leading to large-scale disputes with its clients. (*Id.* at ¶¶ 91, 98.)

In addition to alleging the active involvement in decisions and knowledge of the above facts by Executive Defendants Blankfein, Cohn, and Viniar, Brautigam alleges corporate wrongdoing by the four Outside Directors: because "the Mortgage Department's activities were discussed at every [Firmwide Risk Committee] meeting throughout 2007 . . . there is every reason to believe that [the Executive Defendants] provided all material facts when reporting to each other and to [] Dahlback, [] Friedman, [] George, and [] Johnson." (*Id.* at ¶ 130.)

All Goldman employees and directors were required to comply with Goldman's Code of Business and Ethics, which prohibited them from "knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about [Goldman] to others, whether within or outside" of Goldman because "[t]he integrity of [such] communications is essential to [Goldman's] reputation and success." (Compl. ¶¶ 27-28.) In its 2007, 2008, 2009 and 2010 annual reports, Goldman stated that its "clients' interests always come first," that its reputation was one of its core assets, that it would be "most difficult to restore" its reputation if it were ever diminished, and "integrity and honesty are at the heart of [Goldman's] business." (*Id.* at ¶ 114.) In its 2007 Form 10-K, Goldman explained that "a failure to appropriately identify and deal with

6

conflicts of interest would adversely affect [its] business" because failing or appearing to fail to appropriately identify and address such conflicts would impair Goldman's reputation, which would reduce "the willingness of clients to enter into transactions" with Goldman.[5]  (*Id.* at ¶ 113.)  Brautigam claims that, in light of the above allegations revealing actual conflicts of interest between Goldman and its clients and violations of applicable law, these statements are corporate misrepresentations, which the Individual Defendants "caused the Company to file [in] its Forms 10-Ks [sic] and Annual Reports during the Relevant Period." (*Id.* at ¶ 132.)

       Brautigam further alleges that Goldman's reputation significantly deteriorated in the fallout from the above transactions.  For example, on May 19, 2007, a senior Goldman mortgage trader wrote that the "external perceptions of [Goldman's] franchise[6]. . . is [sic] much lower than [] internally believed" because it was "perceived to be a bottom quartile [collateralized debt obligations] underwriter and to have done several poor deals." (*Id.* at ¶ 101.)  On October 12, 2007, the head of Goldman's European fixed income sales similarly noted that there was a "[r]eal bad feeling across European sales about some of the trades we did with clients" and that "[t]he damage this has done to our franchise is very significant."  (*Id.* at ¶ 104.)  Brautigam also alleges that Goldman suffered damages resulting from costs associated with a congressional investigation into its actions, a raft of ongoing litigation, and a decline in its share price.  (*Id.* at ¶ 120.)

---

[5] Similar statements were included in Goldman's 2008, 2009, 2010, and 2011 l0-Ks. (*Id.* at ¶ 113.)
[6] Blankfein has explained that Goldman's "franchise describes the extent to which [its] clients come to [it] for help, advice, and execution" and that "[f]rom those relationships, business opportunities are brought to [Goldman]." (*Id.* at ¶ 116.)

7

# DISCUSSION

## I. Legal Standard[7]

"The nature of [derivative] action[s] is two-fold." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). First, "the cause of action is the corporation's" because the action asserts "a claim belonging to the corporation to have an accounting from the defendants and a decree against them for payment to the corporation." *Cantor v. Sachs*, 162 A. 73, 76 (Del. 1932). Second, it also asserts the shareholder's "individual right" because "complainants as stockholders have a right in equity to compel the assertion of the corporation's right to redress" where "the corporation will not sue because of the domination over it by the alleged wrongdoers who are its directors." *Id.* Accordingly, a shareholder's right to "prosecute a derivative suit is limited to situations where the [shareholder] has demanded that the [nominal defendant's] directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993). "[T]he demand requirement ... exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits," in "recognition of the fundamental precept that directors manage the business and affairs of corporations." *Aronson*, 473 A.2d at 811-12.

## II. Failure to Make a Pre-Suit Demand on Goldman's Board of Directors

### A. Collateral Estoppel and Res Judicata

Brautigam contends that his failure to make demand on Goldman's board of directors is excused. Goldman argues that Brautigam's contention that demand is excused is barred by the doctrines of collateral estoppel and res judicata, based on *In re Goldman Sachs Mortg. Servicing*

---

[7] In determining whether demand is required or excused, the Court applies the substantive law of Delaware, Goldman's state of incorporation. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98-99 (1991).

8

*S'holder Derivative Litig.,* 2012 WL 3293506 (S.D.N.Y. Aug. 4, 2012) (the "New York Action") and *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104 (Del. Ch. Oct. 12, 2011) (the "Delaware Action").[8]

The federal New York Action does not preclude Brautigam from bringing this lawsuit. Brautigam and the Retirement Relief System of the City of Birmingham, Alabama brought a shareholder derivative action on behalf of Goldman against all of the Individual Defendants, along with additional Goldman executives and directors. Plaintiffs alleged a breach of the defendants' fiduciary duties by (1) causing Goldman to accept federal funds as part of the Troubled Asset Relief Program but failing to comply with that program's conditions; (2) allowing employees of a subsidiary to engage in robo-signing;[9] and (3) including troubled loans in RMBS sold by Goldman. Judge Pauley dismissed plaintiffs' claims, finding, *inter alia,* that plaintiffs' failure to make demand was not excused because Plaintiffs "fail[ed] to raise a reasonable doubt as to a majority of the Board['s] . . . disinterestedness," *In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig.*, 2012 WL 3293506, at *7.

Under federal law of collateral estoppel, "[u]se of collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged.'" *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005) (quoting *Commissioner v. Sunnen*, 333 U.S. 591, 599-600 (1948)). Under the doctrine of res judicata, a prior judgment precludes a second suit only "where the same evidence is needed to

---

[8] In *Richman v. Goldman Sachs Group. Inc.*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012), this Court partially granted and partially denied a motion to dismiss securities fraud claims relating to, *inter alia,* Hudson, Anderson and Timberwolf. *Richman* is not a derivative action, and no demand was necessary.

[9] Specifically, the plaintiffs alleged that the subsidiaries' employees "fraudulently signed ... thousands of foreclosure documents without checking their accuracy." *In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig.*, 2012 WL 3293506, at *1.

support both claims, and where the facts essential to the second were present in the first." *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1464 (2d Cir. 1996) (quotation omitted).  Even if the first and second suits involve "the same parties, similar or overlapping facts, and similar legal issues" this is not dispositive.  *Id.* at 1463.

The New York Action dealt with factually distinct circumstances which affected the analysis regarding whether demand was excused. Though both cases involve allegations relating to Goldman's inclusion of troubled loans in RMBS, the transactions at issue are not the same: the New York Action dealt only with a collateralized debt obligation known as Abacus 2007-ACI ("Abacus"), rather than Hudson, Anderson, or Timberwolf.[10]  Though Judge Pauley's opinion provides substantial insights on when demand is necessary and when it is excused, he does not deal with Hudson, Anderson, or Timberwolf, and thus did not decide whether the director defendants in the New York Action faced substantial liability as to conduct involving those particular transactions.  Additionally, the New York Action involved Paulson & Co., a hedge fund client of Goldman, which approached Goldman in 2006 to structure a transaction that would enable Paulson to short RMBS securities.  This differs from the current action, in which Goldman is alleged to have independently decided to directly bet against its own clients.  The case is thus not "identical in all respects with that decided in the first proceeding," nor is it based on the same facts.  But though a prior judgment is not preclusive, it can still have persuasive effect and compel dismissal.  *Russell v. Kurtz*, 2004 WL 1727145, *1 (S.D.N.Y. June 10, 2004).  As discussed later, the New York Action strongly militates in favor of dismissing Brautigam's complaint for failure to make demand.

---

[10] Though the Individual Defendants claim that the New York Action "plaintiffs expressly alleged that [Goldman's] public disclosures were misleading because of alleged conflicts of interest in the [Hudson, Anderson, and Timberwolf] CDOs, not the Abacus CDO," this is not accurate. (*See* Def. Br. at 13-14 n.11 (citing Walker Decl. Ex. S (New York Action Amended Complaint) ¶ 124); *contra* Walker Decl. Ex. S ¶ 124 (mentioning only Abacus).)

Nor does the Delaware Action preclude Brautigam's claim. The Court applies Delaware law of preclusion, which is similar to federal law, to the Delaware Action.[11] Plaintiffs, shareholders of Goldman, brought a derivative suit against a variety of Goldman directors and executives including all of the Individual Defendants, alleging a breach of their fiduciary duties by (1) approving Goldman's improper compensation structure, (2) wasting corporate resources through improper compensation, and (3) engaging in overly-risky business decisions and unethical and illegal practices. While the Delaware Action included allegations relating to Hudson, Anderson, and Timberwolf in addition to Abacus, the judgment did not assess the alleged corporate misstatements in Goldman's 10-Ks and Annual Reports that are the focus of this lawsuit. Furthermore, the judgment in the Delaware Action singled out Abacus, finding it to be "unique" among the four transactions at issue because plaintiffs failed to plead with "factual particularity that [Hudson, Anderson, and Timberwolf] contain disclosure omissions similar to Abacus." *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *21. Accordingly, the Delaware Action's holding regarding corporate disclosures only related to Abacus. *See id.* ("Though the Plaintiffs allege that the 'Abacus deals are likely just the tip of the iceberg,' conclusory statements are not particularized pleadings. The single Abacus transaction without more is insufficient to provide a reasonable inference of bad faith on the part of the Director Defendants."). The Delaware Action therefore does not preclude this action, which is

---

[11] Under Delaware law,

> The bar of *res judicata* arises where there has been a final judgment on the merits in a first suit involving the same parties, followed by a second suit based on the same cause of action. In those circumstances, *res judicata* bars the second suit. In contrast to *res judicata* . . . collateral estoppel precludes a party from relitigating a fact issue that has previously been litigated and decided in a prior action involving that party. A claim will be collaterally estopped only if the same factual issue was presented in both cases, the issue was litigated and decided in the first suit, and the determination was essential to the prior judgment.

*Smith v. Guest*, 16 A.3d 920, 934 (Del. 2011) (internal quotations omitted).

based on statements the Individual Defendants "caused to be filed" and allegedly knew to be false based on their familiarity with the three CDOs at issue.

**C. Whether Demand in this Action Is Excused**

Though Brautigam's action is not foreclosed by either the Delaware Action or the New York Action, which was dismissed for his failure to make demand, Brautigam still must show that making demand would have been futile in this action; he must adequately allege that the directors were "incapable of making an impartial decision regarding the pursuit of the litigation." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). Plaintiffs bringing derivative actions under Delaware law must meet a higher pleading burden than the plausibility standard of 12(b)(6). *Fink v. Weill*, 2005 WL 2298224 (S.D.N.Y. Sept. 19, 2005). Federal Rule of Civil Procedure 23.1 requires that the Complaint in derivative actions "allege with particularity" the reasons demand is excused. "Vague or conclusory allegations do not suffice to challenge the presumption of a director's capacity to consider demand." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007).

The Court turns now to the question of which standard applies to Plaintiff's assertion of demand futility. Defendant argues that the one-step test established in *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) should be applied. Under the *Rales* test, in order to prove futility of demand, Plaintiff must allege specific facts that "create a reasonable doubt that, as of the time the complaint [was] filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. While maintaining that the Complaint meets the *Rales* test (Pl. Opp. Mem. 11-12), Plaintiff argues that the two-step test in *Aronson*, 473 A.2d at 814 (Del. 1984) is more appropriate. Under the *Aronson* test, plaintiff must plead particularized facts that create a reasonable doubt that (1) the

directors are disinterested and independent, or (2) the challenged transaction was a valid exercise of business judgment. *Aronson,* 473 A.2d at 814. Determining which test to apply hinges on whether the Board of Directors' action is being challenged. The *Aronson* test applies to derivative claims that challenge a business judgment of the board – a board action – while the *Rales* test applies "where the subject of a derivative suit is not a business decision of the board[,] but rather a violation of the Board's oversight duties." *Wood*, 953 A.2d at 140.

Plaintiff's claim fails under either test. The Complaint does not sufficiently allege that the majority of the directors were interested or dependent, or that the director defendants had knowledge that any disclosures or omissions were false or misleading; it therefore fails the *Aronson* test. The Court finds, however, that *Rales* provides the appropriate test for this derivative suit. Here, Plaintiff alleges that Goldman directors signed misleading statements about ongoing conflicts of interest between the company and its clients, and that Goldman misrepresented its position with regard to certain collateralized debt obligations referencing subprime residential mortgage-backed securities. Claims alleging that directors violated their fiduciary duties based on corporate misstatements are failure of oversight claims evaluated under *Rales*. *See Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995) (applying *Rales* to claims alleging that certain board members signed misleading statements on behalf of the corporation); *Rahbari v. Oros*, 732 F. Supp. 2d 367, 374-76 (S.D.N.Y. 2010) (applying *Rales* to allegations that directors signed filings containing misstatements). Here, despite Plaintiff's allegations regarding Goldman's misrepresentations about current conflicts of interest, the stability of Goldman's business, and Goldman's interest in the three CDOs at issue, "[P]laintiff does not challenge any specific board action that approved or ratified the [] alleged wrongdoings." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995). Allegations that directors merely

13

allowed or "caus[ed] to be signed" certain corporate misstatements do not provide sufficient grounds to apply *Aronson*.  *See id.*

Under the *Rales* test, reasonable doubt that a board could have exercised disinterested and independent business judgment in considering demand is established where a majority of the board of directors faces a "substantial likelihood" of personal liability from the legal action. *Rales*, 634 A.2d at 936 (citing *Aronson,* 473 A.2d at 815).  The "mere threat" of personal liability is not enough to render a director interested.  *Id.*  "Demand is not excused solely because the directors would be deciding to sue themselves."  *In re Citigroup Inc. Shareholder Derivative Litigation*, 964 A.2d 106, 121 (Del. Ch. 2009).  If merely naming board members as defendants or including their names offhandedly in a complaint were sufficient to excuse demand, the requirement would be meaningless.

Blankfein, Cohn, and Viniar have a substantial exposure to liability.  They were employee directors at the time in question. The allegations in this action—the claimed misstatements and omissions, the conflicts of interest pertaining to Hudson, Anderson, and Timberwolf, and specific facts and documented communications showing the executive directors' knowledge of conflicts of interest—were the basis of a securities fraud action against them.  *See Richman v. Goldman Sachs Group, et al.*, 2012 U.S. Dist. LEXIS 86556 (S.D.N.Y. June 21, 2012).  But the fact that three directors may be "interested" is not sufficient to excuse demand.  Plaintiffs in derivative suits must raise a reasonable doubt as to a *majority* of the board members' disinterestedness.  *See Rattner v. Bidzos*, 2003 WL 22284323, at *13 (Del. Ch. Oct. 7, 2003).  Goldman has a 13 member board. (Compl. ¶ 127.)  Proving disinterestedness of the board majority in this case therefore requires Plaintiff to prove that the four Outside Directors –

Defendants Dahlback, Friedman, George and Johnson – face a "substantial likelihood" of personal liability from the legal action.

The Outside Directors' risk of personal liability must be assessed in light of Plaintiff's underlying claim against them. This action is properly classified as a *Caremark* claim.[12] Plaintiff alleges a failure of oversight. Plaintiff's claims, particularly as to the Outside Directors, allege that the directors breached their fiduciary duties because they (1) knew about volatility in the subprime mortgage market; (2) were charged with "overseeing the Company's compliance with legal and regulatory requirements and the Company's management of market, credit, liquidity and other financial and operational risks" (Compl. ¶ 135), and nonetheless (3) "caused the Company to file [] Forms 10-Ks [sic] and Annual Reports" (Compl. ¶ 132) containing misrepresentations and omissions regarding Goldman's dedication to clients, lack of conflicts of interest, and compliance with the law. Claims alleging that directors caused or allowed corporate misstatements to be made must meet the *Caremark* standard. *Loveman v. Lauder*, 484 F. Supp. 2d 259, 266, 270 (S.D.N.Y. 2007).

*Caremark* claims require proof that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del. Ch.

---

[12] *Caremark* held that directors have a duty to establish appropriate internal monitoring and reporting systems reasonably designed to provide senior management and the board itself with sufficient information to make informed decisions and ensure compliance with the law. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

1996). In this case Plaintiff concedes that corporate governance and reporting systems were in place (*see* Pl. Opp. Mem. of Law at 16); hence, Plaintiff's claim must be analyzed under subpart (b). Since Goldman's certificate of incorporation specifically immunizes its directors from personal liability for actions taken in good faith (Walker Decl. Ex. J. at Art. 12), "plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, i.e., that they had 'actual or constructive knowledge' that their conduct was legally improper." *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008).

Plaintiff has failed to allege facts showing that the Outside Directors face a substantial risk of liability in this lawsuit. Unlike the Executive Directors, the Outside Directors are not executives or even employees of Goldman, and there is not a pending securities fraud action against them for the misstatements and omissions underlying this derivative action. While the Complaint includes specific facts that allege that the Executive Directors made and directly managed decisions regarding the three CDOs at issue—Hudson, Anderson, and Timberwolf—these facts are noticeably absent from the allegations about the Outside Directors. The Complaint fails to make particularized pleadings that any of the Outside Directors made decisions regarding the CDOs, knew what disclosures were and were not made to prospective CDO investors, or had knowledge of any details of Goldman's transactions regarding the short and long positions it took in the CDOs (from which the conflicts of interest are alleged to have arisen). There are no specific factual allegations to support that the Outside Directors "consciously disregarded" wrongdoing or "knew that they were not discharging their fiduciary obligations." *Citigroup*, 964 A.2d at 123.

Plaintiff alleges that the Outside Directors must have known about the alleged misconduct because Goldman has internal reporting requirements and a robust governance

structure, and the Outside Directors were members on Goldman's Audit and Risk committees. These claims fail. In Brautigam's prior New York Action, Judge Pauley rejected these very arguments in holding that demand was not excused. *In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig.*, 2012 WL 3293506, at *6-7. Specifically, he held that allegations of robust internal reporting requirements are no substitute for particularized pleadings of specific sources of director knowledge. *Id.* at *6-7. Likewise, Judge Pauley rejected Plaintiff's argument that the Outside Directors' attendance at a 2007 presentation updating the Board on developments in the mortgage market established their knowledge. *Id.* at *8. As in the New York Action, Plaintiff fails to plead particularized facts showing that the presentations allegedly attended by the Outside Directors mentioned the three CDOs at issue in this case, let alone any misconduct. (Walker Decl. Exs. T, U.) Merely alleging membership on a committee does not meet the standard for particularized pleading under Rule 23.1 necessary to establish that directors had knowledge of alleged misconduct. *See Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008).

Even if the Outside Directors' knowledge could be inferred from the Complaint's allegations – and it cannot – pleading that these defendants "caused" the Company to issue misstatements does not meet the particularized pleading requirement of Rule 23.1, since "[i]t is unclear from such allegations how the board was actually involved in creating or approving the statements, factual details that are crucial to determining whether demand on the board of directors would have been excused as futile." *Citigroup*, 964 A.2d at 133 n. 88. Furthermore, the Complaint falls far short of alleging that the Outside Directors acted in bad faith in whatever role they may have played in the issuance of the alleged misstatements.

The stringent requirements of particularized factual pleadings under Rule 23.1 serve an important purpose: "to preserve the primacy of board decisionmaking regarding legal claims

belonging to the corporation." *Am. Int'l Group, Inc., Consol. Derivative Litig.*, 965 A.2d 763, 808–09, 2009 WL 366613, at *29 (Del. Ch. 2009). Because Plaintiff has failed to plead particularized facts that create a reasonable doubt that a majority of Goldman's Board of Directors could have exercised disinterested and independent business judgment in considering demand, Plaintiff's failure to make demand is not excused.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss the Complaint for Plaintiff's unexcused failure to make demand. The Clerk of Court is directed to enter judgment and close this case.

Dated: New York, New York

March 26, 2014

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge